Victor JOHNSON, Plaintiff–Appellant,

v.

Monica **RODRIGUES** (OROZCO); Sealed DFT–98–550–1; Sealed DFT–98–550–2, and Adoption Center of Choice, Defendants–Appellees.

No. 01–4156.

United States Court of Appeals, Tenth Circuit.

June 18, 2002.

C. Robert Collins of Collins & Collins, Phoenix, AZ, for Plaintiff–Appellant.

Karra J. Porter (Barton H. Kunz II with her on the brief) of Christensen & Jensen, P.C., Salt Lake City, UT, for Adoption Center of Choice Defendant–Appellee.

Phillip E. Lowry of Howard, Lewis & Petersen, Provo, UT, for sealed Defendants–Appellees.

Before TACHA, Chief Judge, ALDISERT,* and SEYMOUR, Circuit Judges.

ALDISERT, Circuit Judge.

Appellant Victor Johnson of Arizona, putative father of a child born out of wedlock

---

* Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

and subsequently adopted by a married couple, filed a complaint in the district court against the biological mother, the adoptive parents and The Adoption Center of Choice. He contended that the Utah Adoption Statute, as applied to him, violated the Due Process Clause of the Fourteenth Amendment. UTAH CODE ANN. §§ 78–30–1 to 78–30–19 (1996 & Supp. 2000). He also asserted various state law claims.

He sought a judgment declaring that the Utah state courts "were without jurisdiction over Appellant to terminate his parental rights," because the Utah Adoption Statute was unconstitutional. Appellant's Brief at 30. Because the defendants were citizens of Utah, or a state other than Arizona, he averred subject matter jurisdiction based on diversity of citizenship. Upholding the constitutionality of the statute, the district court granted summary judgment in favor of the defendants on both federal and state issues.

In the original briefing before us, the parties discussed the merits of the constitutional argument. We asked for supplemental briefing on whether a claim based upon a Fourteenth Amendment deprivation could properly be lodged against non-public defendants, and heard oral argument on the question of whether Appellees acted under color of state law. We now decide that Appellees were not state actors, and affirm the judgment of the district court without meeting the substantive constitutional question. We affirm also the district court's treatment of claims brought under Utah law.

## I.

The district court originally had jurisdiction over this matter pursuant to 28 U.S.C. § 1332. A timely appeal was filed pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure. We have jurisdiction pursuant to 28 U.S.C. § 1291.

"The Court reviews a district court's decision to grant summary judgment *de novo,* applying the standard set forth in Fed.R.Civ.P. 56(c)." *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231 (10th Cir.2001); *Byers v. City of Albuquerque,* 150 F.3d 1271, 1274 (10th Cir.1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

## II.

Because of the view we take, only a brief review of the extensive factual and procedural background is necessary. Victor Johnson and Monica Rodrigues Orozco engaged in a brief sexual relationship in 1996 in Phoenix, Arizona. Throughout this "relationship," which lasted between one to two months, Johnson did not even know Orozco's last name. Appellee's Supp.App. at 139–142, 196. Indeed, Johnson apparently knew very little about Orozco. He was unaware of how he had met her, how she was employed, where she was from, where she had gone to school, whether she had siblings, or even the name of her daughter. *Id.* at 133–135. He considered his association with Orozco to be casual, and when a person he referred to as his "girl friend" returned from California with the two children he had fathered with her, he promptly ended the relationship with Orozco. *Id.* at 152.

Approximately a week thereafter, Orozco telephoned Johnson's home to inform him of her pregnancy. Her call was answered by Tracy Dennis, Johnson's former girlfriend, who was still living with Johnson, along with his current girlfriend, and his current girlfriend's children. Notwith-

standing these unique entangling domestic alliances, Johnson drove to Orozco's home and asked her to take a home pregnancy test he had purchased. He handed the testing materials to her and awaited the results. Orozco then told him that she had made a mistake while administering the test, and did not get a result.

Approximately three months later, a friend told Johnson that Orozco was, in fact, pregnant. Confronted with this news, Johnson took no action. The following month, he was told again by the same friend that Orozco was pregnant. Again, he did nothing. Some three months passed and Johnson encountered Orozco at a chance meeting in a Phoenix mall, when she was seven and a half months pregnant. When he told her that he would be willing to take care of her financially, she told him that because he had not been willing to help her out early in the pregnancy, she was not interested in his help at this late stage.

Monica decided to place the child for adoption. On February 1, 1997, she traveled to Orem, Utah, and contacted the Adoption Center of Choice. It placed her in an apartment to await full term. Johnson was unaware that she had gone to Utah. On March 5, 1997, Orozco gave birth to a daughter, and on the following day relinquished her parental rights to the adoption center at 2:15 p.m. At 3:15 p.m., the agency examined the birth certificate and determined that no father had been named. It then searched the Utah Bureau of Vital Records' putative father list, and found no paternity claims regarding Orozco's child. Later that day, the infant was placed with its adoptive parents.

Orozco left Utah the following week to stay with an aunt in Wisconsin. Shortly after the child's birth, Johnson learned from Orozco's former roommate that the child had been born. About a month later, on April 15, 1997, Johnson went to Orozco's mother and told her of his intent to seek custody of her daughter's child.

### III.

There followed a series of legal proceedings. On April 17, 1997, the adoptive parents filed a verified petition for adoption in Utah's Fourth District Court. Under Utah law, a decree of adoption may be entered six months after the child is placed in the adoptive parents' home. On May 1, 1997, in an Arizona state court, not a Utah court, Johnson filed a complaint for paternity and child custody against "Monica Rodrigues" [Orozco]. However, he did not file a paternity claim with the Arizona Bureau of Vital Records. The Arizona court ordered Johnson, Orozco, and Orozco's baby to undergo laboratory paternity testing, and set another hearing date.

On June 12, 1997, Johnson filed a notice of commencement of paternity proceedings with the Utah Bureau of Vital Records. Soon thereafter, Johnson procured domestic relations subpoenas directed towards the Utah Bureau of Vital Records and the Utah hospital where Orozco's baby was born. A hearing on Johnson's request was held in Arizona on August 5, 1997, at which time the court ordered the Utah hospital to release the medical records to Johnson. Orozco did not attend the hearing.

On September 8, 1997, Johnson filed a petition in the Fourth District Court of Utah to register the Arizona court order. The order was filed on September 18, 1997. The final decree of adoption in favor of the baby's adoptive parents was issued by the Fourth District Court of Utah on September 24, 1997.

After the adoption was finalized, Johnson made harassing telephone calls to the adoptive parents, having learned their identity from confidential information he had obtained. Over the telephone, he pre-

tended to be someone else, and asked the adoptive parents personal questions about the infant. The adoptive parents reported the phone calls to the local police, who then contacted Johnson.

Johnson then filed an action in the United States District Court for the District of Arizona on November 21, 1997, alleging (1) tortious interference with family relations, (2) violation of the Parental Kidnaping Prevention Act, and (3) intentional infliction of emotional distress. He sought damages of $1,000,000, as well as custody of the child. The court dismissed his case on May 18, 1998, holding that it lacked personal jurisdiction over the defendants.

Seven months later, on June 26, 1998, Johnson filed the present action in the United States District Court for the District of Utah. The court granted the motion for dismissal filed by the adoption center and the adoptive parents, stating, inter alia, that it lacked subject matter jurisdiction under *Rooker–Feldman* abstention. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Johnson appealed to this court, which affirmed in part and reversed in part, determining that neither Johnson's constitutional nor tort claims fell within the teachings of *Rooker–Feldman*. We determined that "neither Plaintiff's constitutional claim challenging the Utah adoption laws nor his tort claim [fell] within the domestic relations exception. These claims should be considered and decided on remand by the district court." *Johnson v. Rodrigues*, 226 F.3d 1103, 1112 (10th Cir.2000). Upon remand, the parties filed cross-motions for summary judgment. The court granted the joint motion filed by the adoption cen-

ter and the adoptive parents, and denied Johnson's motion.

Shortly before the adoptive infant's fifth birthday, Johnson appealed the summary judgment ruling to this court.

## IV.

Appellant argues here, as he did in the district court, that he is not basing his claim on 42 U.S.C. § 1983. This he does, notwithstanding the fact that the district court opinion begins with the following statement: "Plaintiff Victor Johnson's claims in this lawsuit, brought under 42 U.S.C. § 1983 . . ." *Johnson v. Rodrigues*, No. 2:98–CV–550C, *Order* at 1 (D.Utah. 2001) (hereinafter *"Order"*). It cannot be denied that Victor Johnson is alleging a violation of the Fourteenth Amendment that provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

Irrespective of whatever label Appellant wishes to place on the procedural vehicle he is utilizing to assert a Fourteenth Amendment deprivation, it is beyond cavil that in order to prevail, the United States Constitution requires activity by a state. The procedural vehicle for this action in a federal court is found in the Civil Rights Act of 1874, partially codified in 42 U.S.C. § 1983.[1]

The Court has explained that:

> A claim upon which relief may be granted to [plaintiffs] against [defendants] un-

---

1. By contrast, a state court action challenging the adoption proceedings would not necessarily involve the same requirements as a federal action alleging the deprivation of a Fourteenth Amendment right.

der § 1983 must embody at least two elements. [The plaintiffs] are first bound to show that they have been deprived of a right "secured by the Constitution and the laws" of the United States. They must secondly show that [defendants] deprived them of this right acting "under color of any statute" of the [state]. It is clear that these two elements denote separate areas of inquiry.

*Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Assuming that Johnson has alleged a deprivation of a federal right, we then proceed to decide whether he has fulfilled the second requirement, namely, a demonstration that either the adoption center or the adoptive parents acted under color of state law.

The Court has created a two-part test to determine whether a private person's action constitutes state action:

First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

## V.

To support a thesis that Appellees acted under color of state law, Johnson summarized his argument as follows:

The adoption placement was under "color of state law and is thus subject to section 1983 liability." It cannot be said

that Appellees are [sic] "nominally private party;" but rather they are actors. There is a "nexus" between what the state requires of Appellees and what the state an [sic] Appellees actually do. The relationship is also "symbiotic" and results in "joint action" between the state and private adoption agencies. The "promotion" of adoption is a "traditional public power" and "public function."

Appellant's Supp. Brief at 6–7. We now turn to these contentions.

■ It is undisputed that neither the adoption agency, a private party, nor the adoptive parents, other private parties (the Appellees here), are employees of the state of Utah. Private individuals and entities may be deemed state actors, however, if they have "acted together with or [have] obtained significant aid from state officials, or [if their] conduct is otherwise chargeable to the state." *Lugar,* 457 U.S. at 937, 102 S.Ct. 2744.

In *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442 (10th Cir.1995), we issued a comprehensive opinion that discussed in detail the tenets of what constitutes action under "color of law" by private parties. We discussed therein four tests delineated by the Court to determine whether private parties should be deemed state actors when conducting a state action analysis: (1) the public function test, (2) the nexus test, (3) the symbiotic relationship test and (4) the joint action test.

The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case. In some instances, the Court has considered "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." The Court has also inquired whether the state has "so far insinuated itself into a

position of interdependence" with the private party that there is a "symbiotic relationship" between them. In addition, the Court has held that if a private party is a "willful participant in joint activity with the State or its agents," then state action is present. Finally, the Court has ruled that a private entity that exercises "powers traditionally exclusively reserved to the State" is engaged in state action.

Under each of these four tests, "the conduct allegedly causing the deprivation of a federal right" must be "fairly attributable to the State." In order to establish state action, a plaintiff must demonstrate that the alleged deprivation of constitutional rights was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." ... In order to resolve the state action question before us, we will apply these general principles and each of the tests articulated by the Supreme Court.

49 F.3d at 1447 (citations omitted). Appellees respond that the adoption center and the adoptive parents cannot be considered state actors under any test. We agree.

### A.

█ The public function test consists of determining whether the state has delegated to a private party "a function traditionally exclusively reserved to the States." *Id.* This is an arduous standard to satisfy. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros.*, 436 U.S. at 158, 98 S.Ct. 1729 (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 356, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). This often involves situations such as when private parties hold elections, perform necessary municipal functions, or run a nursing facility. In situations such as these, the actions taken were considered to be equivalent to state action, because the private parties performed a service which was traditionally the exclusive prerogative of the state.

Johnson has not presented any evidence indicating that the adoption center or adoptive parents are the "exclusive means to adopt children in Utah." Indeed, four and a half pages of adoption agencies are listed in the Salt Lake City Yellow Pages. Because all actors involved here were private parties, and there was no exclusive state involvement in the adoption process, we agree that there was no state action under the public function test.

### B.

█ "Under the nexus test, a plaintiff must demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Gallagher*, 49 F.3d at 1448 (citing *Jackson*, 419 U.S. at 351, 95 S.Ct. 449). We have stated that under this approach, "a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Merely availing oneself of state judicial procedures is insufficient to constitute state action. *Lugar*, 457 U.S. at 939 n. 21, 102 S.Ct. 2744.

Johnson has not presented any evidence indicating a nexus between the state of Utah and either the adoptive parents or the adoption center. Further, he has not demonstrated that the state exercised coercive power or provided significant encouragement to the parties involved. Monica Orozco and the adoptive parents made a private decision—without either state support or encouragement—to voluntarily

avail themselves of the state's adoption laws. The adoption center made a private decision to facilitate the adoption. Thus, no nexus existed between either of the private parties and the state of Utah.

### C.

■ Under the analysis referred to as the "symbiotic relationship test," the state must have " 'so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.' " *Gallagher*, 49 F.3d at 1451 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). We have noted that "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action." *Id.* Our research indicates that the first reference to the word "symbiotic" in discussing the color of law concept appears to be found in *Moose Lodge v. Irvis*, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) where the court noted:

> Here there is nothing approaching the symbiotic relationship between lessor and lessee that was present in *Burton*, where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was able to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of the building constructed for that purpose to commercial lessees such as the owner of the Eagle Restaurant. Unlike *Burton*, the Moose Lodge building is located on land owned by it, not by any public authority.

Johnson has not alleged any facts which would indicate that the state of Utah has insinuated itself into a position of long-term interdependence with either the adoption center or the adoptive parents. In *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), the Court emphasized:

> Our cases try to plot a line between state action subject to the Fourteenth Amendment scrutiny and private conduct (however exceptional) that is not.... What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

*Brentwood*, 531 U.S. at 295, 121 S.Ct. 924.

Having stated the foregoing, the Court then introduced a new locution into the legal lexicon for use in determining whether a private party's actions constituted state action—entwinement.

> The entwinement down from the State Board in therefore unmistakable, just as the entwinement up from the member public schools is overwhelming. Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards; entwinement to the degree shown here requires it.

*Id.* at 302, 121 S.Ct. 924.

Speaking through Justice Souter, the Court found "entwinement"[2] in light of the

**2.** But see the opening sentence in the dissenting opinion in *Brentwood:* "We have never found state action based upon mere 'entwine-

ment.' " *Brentwood*, 531 U.S. at 305, 121 S.Ct. 924 (Thomas, J., dissenting).

fact that 84 percent of the members of the interscholastic athletic association were public schools.[3] Thus, although the nomenclature is new, its meaning appears to be comparable to what the Court has previously described as a "symbiotic relationship."

Symbiosis is defined as "the living together in more or less intimate association or even close union of two dissimilar organisms" or "the intimate living together of two dissimilar organisms in any of various mutually beneficial relationships; mutual cooperation between persons and groups in a society especially when ecological interdependence is involved." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED (1968). Entwinement is defined as "the action of entwining," while the definition of entwine is "to twine together, to interweave, attach or involve inextricably in sentiment or thought." *Id.*

The only state involvement alleged by Johnson was the issuance of the adoption decree by a state court. The Court has noted that "a private party's mere invocation of state legal procedures [does not] constitute[ ] joint participation or conspiracy with state officials satisfying the § 1983 requirement of action under color of law." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. at 939 n. 21 (internal quotations omitted).

In the circumstances alleged in the case at bar, there was no close union between Utah and either of the private Appellees, and no interweaving between them and the state. Thus, whether tested from the standpoint of a symbiotic relationship or its related concept, entwinement, the Appellees' conduct did not constitute activity under color of state law.

**D.**

■ Under the joint action test, "state action is also present if a private party is a 'willful participant in joint action with the State or its agents.'" *Gallagher,* 49 F.3d at 1453 (citing *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)). When applying this analysis, courts generally "examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* Most decisions discussing this concept hold that if there is a substantial degree of cooperative action between state and private officials, or if there is "overt and significant state participation" in carrying out the deprivation of the plaintiff's constitutional rights, state action is present. *Id.* at 1454 (citing *Hoai v. Vo,* 935 F.2d 308, 313 (D.C.Cir.1991)). This was not present here.

**VI.**

Although we have referred to the foregoing analyses as "tests," the Third Circuit has noted the emphasis on "facts" in the Court's *Brentwood* decision:

The Supreme Court has established a number of approaches to this general question [of what private activity can be attributed to the state] which it recently said are essentially "facts that can bear

---

**3.** This apparently is the most noteworthy difference that prompted the Court to distinguish the facts in *Brentwood* from those in *National Collegiate Athletic Assoc. v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). State action was found in *Brentwood,* which involved a private corporation that organized interscholastic athletics and sponsored tournaments among private and public high schools. *Tarkanian* involved an unincorporated association consisting of approximately 960 private and public universities and colleges. The association promulgated rules governing member institutions' recruiting, admissions, academic eligibility and financial aid standards for student athletes. In *Tarkanian* the Court found there was no state action.

on the fairness of such an attribution." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Regardless of whether these are "test" or "facts," *Brentwood* directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of a central purpose: to "assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Id.* at 295 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis in original)).

*Crissman v. Dover Downs Entm't*, 289 F.3d 231, 239 (3d Cir.2002) (en banc). The *Crissman* court further noted:

> The Supreme Court pointed out in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), that it has never been clear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation." *Id.* at 939, 102 S.Ct. 2744. *See also Groman v. Township Manalapan*, 47 F.3d 628, n. 16 (3d Cir. 1995). *Brentwood* seems to embrace the second understanding.

*Id.* at 239 n. 12.

It bears mention that in *Brentwood*, the Court emphasized that "[s]tate action may be found if, though *only if*, there is such a 'close nexus *between the State and the challenged action*' that seemingly private behavior 'may be fairly treated as that of the State itself.'" 531 U.S. at 295, 121 S.Ct. 924 (citing *Jackson*, 419 U.S. at 351, 95 S.Ct. 449) (emphasis added).

## VII.

 Johnson alleged no facts demonstrating any degree of cooperative action or overt, significant participation by Utah state officials. The only action arguably taken by a state official is the issuance of the adoption decree by the state court. As we have previously demonstrated, this is not enough.

Johnson describes in detail how the adoption center and the adoptive parents worked together to effectuate the adoption, insinuating that the combination of their efforts was tantamount to a conspiracy to deprive him of his constitutional rights, all with the imprimatur of the state. His problem, however, is that he neglects to set forth with any specificity the role the state of Utah played in this alleged conspiracy. Appellant's Supp. Brief at 5.

 Finally Johnson asserts, with no supporting factual basis, that the adoption agency acted under the authority of the state of Utah and "... represented the state in the capacity [of placement of children for adoption]." *Id.* at 6. He notes the statutory mandate that licensed adoption agencies should "promote adoption when that is a possible and appropriate alternative for a child." *See* Utah Code 62A–4a–607. To encourage private agencies to promote adoption does not metamorphose private performance into government activity.

Accordingly, because the rights assured by the Fourteenth Amendment refer to state action, and having determined that Appellees did not act under color of state law, we hold that Appellant may not prevail on his constitutional contentions.

## VIII.

Appellant alleged two state tort claims in his original action: intentional infliction of emotional distress and tortious interference with family relations. The district court rejected both claims. Johnson argues that the district court was precluded from even addressing the merits of these

claims because this court "had already decided in the first appeal that the tort claims should be allowed ..." Appellant's Brief at 24–25. He also argues that the act of dismissing these state claims was "not within the subject matter jurisdiction fo [sic] the District Court ..." *Id.* at 24. When this case was before us previously, we explicitly directed that "[t]hese [tort claims] should be considered and decided on remand to the district court." *Johnson v. Rodrigues,* 226 F.3d at 1112.

### A.

▮▮▮ To state a claim for intentional infliction of emotional distress in Utah, a plaintiff must demonstrate "that the defendant intentionally engaged in some conduct toward the plaintiff considered outrageous and intolerable in that it offends the generally accepted standards of decency and morality." *Russell v. Thomson Newspapers, Inc.,* 842 P.2d 896, 905 (Utah 1992). Under Utah law, this is a question of law to be decided by the courts. *DeBry v. Godbe,* 992 P.2d 979, 986 (Utah 1999). Making this demonstration involves a heavy burden in which the plaintiff must exhibit "extraordinarily vile conduct, conduct that is 'atrocious, and utterly intolerable in a civilized community.'" *Retherford v. AT & T,* 844 P.2d 949, 978 n. 19 (Utah 1992).

▮▮▮ Johnson suggests that the conduct of one employee of the adoption center was outrageous because the employee refused to reveal personal information about the adoption to Johnson, and then expressed doubts about his financial ability to bring a law suit. He asserts that the adoptive parents also exhibited outrageous behavior by calling the police and reporting that someone (Johnson himself, as was later discovered) was calling their home and pretending to be someone else, in an attempt to fraudulently elicit personal information about the adopted child. Appel-

lant's Brief at 28–29. The district court held that "[e]ven if the adoptive parents had inexplicably reported Johnson to the police for no reason, such would not rise to the level of 'outrageous and intolerable' conduct—as Johnson was only embarrassed and 'pissed off' by the unexpected police visit." *Johnson v. Rodrigues, Order* at 21.

The district court held that the adoption center's actions conformed with the Utah Adoption Statute, and as such, "Defendants' actions in conformity with this statute, therefore, cannot be said to be 'outrageous and intolerable' under Utah law." *Id.* at 22.

### B.

▮▮▮ Appellant appears to assert his tortious interference claim against the adoption agency, as well as against the adoptive parents. The district court plainly stated that there "is some doubt as to whether such a cause of action exists at all under Utah law." *Id.* It held that "[e]ven assuming, without holding, that such a cause of action exists ... it appears from the facts of this case that Johnson would be unable to bring such an action ... [because] '[p]arental rights do not spring full-blown from the biological connection between parent and child ... [but rather] require relationships more enduring.'" *Id.* at 23 (citing *Lehr,* 463 U.S. at 260, 103 S.Ct. 2985).

Although Appellant was fully aware of the district court's doubts regarding whether such a cause of action exists, he was unable to supply this court with Utah state cases or statutes supporting his contention. He refers to *Norton v. Macfarlane,* 818 P.2d 8 (Utah 1991), which, he says, "specifically acknowledged the right of a party to recover in tort when his family relationships are even negligently injured by a third party." Appellant's Brief at 29. Although *Norton* acknowl-

edges that the Utah Constitution allows damages for loss of consortium interests that arise in a wrongful death action, this does not "constitute an independent parental action for alienation of affections, especially when not associated with a wrongful death case." Appellee's Brief at 45.

The district court commented:

Johnson did not attempt to create any sort of family relationship with Orozco before the child's birth, and his claim of paternity was filed only after the baby had already been born and placed with its adoptive parents. Johnson's connection with the baby, at least before the baby's birth, was biological only. Under these circumstances, it cannot be said that Defendants' actions could have represented interference with any constitutionally protected "family relationship."

*Order* at 23. We hold that the district court did not err in granting summary judgment to the adoption center and the adoptive parents on the state tort issues.

\* \* \* \* \* \*

For all the foregoing reasons we affirm the judgment of the district court.