**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

THE TOOL BOX, a Utah corporation,

Plaintiff-Appellant,

v.

OGDEN CITY CORPORATION, a
Utah municipal corporation,

Defendant-Appellee.

No. 01-4134

---

## ON REHEARING EN BANC
## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## (D.C. NO. 1:00-CV-62-B)

---

W. Andrew McCullough of McCullough & Associates, LLC, Midvale, Utah
(Michael W. Gross of Schwartz & Goldberg, PC, Denver, Colorado, with him on
the briefs), for Plaintiff-Appellant.

Donald L. Dalton of Dalton & Kelley, Salt Lake City, Utah, for Defendant-
Appellee.

---

Before **TACHA,** Chief Judge , **SEYMOUR, PORFILIO, EBEL, KELLY,
HENRY, BRISCOE, LUCERO, MURPHY, HARTZ, O'BRIEN,
McCONNELL,** and **TYMKOVICH,** Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

The Tool Box, Inc., wishes to open a nude-dancing establishment in Ogden City, Utah, within the boundaries of the Ogden Commercial and Industrial Park (the Industrial Park). Because the Industrial Park is zoned M-2, the location of the establishment would not violate the requirements of the City's ordinance regulating businesses that are sexually oriented (the BSO Ordinance). The Industrial Park is also subject, however, to the Ogden Commercial and Industrial Park Protective Covenants (the Protective Covenants), which were adopted by the City as owner of the land within the Industrial Park. The City denied Tool Box a building permit for the proposed nude-dancing establishment after ruling that the establishment would violate the Protective Covenants.

Tool Box brought suit under 42 U.S.C. § 1983 in federal court, seeking damages and injunctive relief against the City for violation of its constitutional rights. The district court granted the City's motion for summary judgment. Tool Box appealed, contending that the broad, vague language of the Protective Covenants conveyed unbridled discretion to the City, so that the Covenants constituted a prior restraint prohibited by the First Amendment (as applied to the States through the Fourteenth Amendment). A divided panel of this court agreed and reversed the district court. *Tool Box v. Ogden City Corp.*, 316 F.3d 1167 (10th Cir. 2003). We granted the City's request for en banc review and now affirm the judgment below.

**Background**

The City created the Industrial Park on City-owned property in 1976. The Protective Covenants were adopted in 1995 in anticipation of the sale, lease, and other development of the property. The record on appeal does not indicate how the covenants were authorized. But the parties have treated them as the equivalent of a municipal ordinance, which we will do as well.

The Protective Covenants recite both permitted and prohibited uses. Paragraph IV, entitled "Permitted Uses," states:

> The purpose of the Industrial Park to be developed on the lands described in Exhibit A is to create a wholesome environment for the conduction of selective manufacturing and marketing enterprises which do not create a hazard or are not offensive due to appearance or to the emission of noxious odors, smoke or noise, and to promote research laboratories and regional office facilities.
>
> Allowed uses in the Industrial Park shall include manufacturing, fabrication, wholesale and distribution purposes, offices, service facilities for the Industrial Park occupants, and similar uses which create benefits to local commerce and the development for additional employment opportunities.

App. at 26. Paragraph V, entitled "Prohibited Uses," states:

> No portion of the property may be occupied for any of the following uses:
> (1) Residential purposes, except for the dwelling of watchman or other employees attached to a particular enterprise authorized in the area.
> (2) Manufacture, storage distribution or sale of explosives.
> (3) Storage in bulk of junk, wrecked autos or other unsightly or second-hand materials.

(4) No portion of the premises or any portion thereof of any building or structure thereon at any time shall be used for the manufacturing, storage, distribution or sale of any products or items which shall increase the fire hazard of adjoining premises, or which emit noise or vibrations which will injure the reputation of said premises of the neighboring property or for any use which is in violation of the ordinances of Ogden City and the laws of the State of Utah.

*Id.* at 26-27. Other paragraphs relate to yard space, loading docks, parking requirements, building and construction requirements, storage, signs, and landscaping and maintenance.     *Id.* at 27-28.

To enforce the Protective Covenants, the Industrial Park Review Board (the Review Board) was created. Composed of three persons appointed by the Mayor—two City employees and a representative of an owner of land in the Industrial Park—the Review Board makes the initial decision, which can be appealed to the Mayor.     *Id.* at 26.

In the meantime, in 1990 the City enacted its BSO Ordinance. As do numerous such ordinances enacted around the country, the BSO Ordinance limits BSOs to areas of the City with certain zoning classifications and also controls the density of BSOs. Among the areas where zoning permits BSOs is the Industrial Park. In July 2000, 5.19% of the City's area, not including the Industrial Park, was available for such businesses. App. at 58. There were three BSOs operating in the City at that time.     *Id.*

-4-

In late 1999 a private owner of property in the Industrial Park agreed to lease the property to Tool Box's owner for the purpose of constructing a nude-dancing establishment. *Id*. at 36. Tool Box then sought City approval. On January 3, 2000, the Ogden City attorney informed Tool Box that the Protective Covenants "will not constitute a bar to your client's proposed business." App. 38. But the Review Board disagreed. On April 12, 2000, it ruled as follows:

> 1. In the judgement of the board, the proposed use is not in keeping with the stated purposes of the industrial park which is to create a wholesome environment for selective manufacturing, fabrication and other allowed uses.
> 2. The proposed use conflicts with those types of businesses which are identified as "allowed uses" and which advance the purposes for which the industrial park was established.

*Id*. at 40. On appeal the Mayor affirmed, stating:

> [T]he decision of the Review Board [is] a reasonable and carefully considered determination that the Protective Covenants do not allow for a sexually oriented business use and that such a use is not consistent with the purpose and intent of the Protective Covenants to promote selective manufacturing and marketing enterprises.

*Id*. at 44. As a result, a building permit was denied. Tool Box filed suit on June 1, 2000.

**Discussion**

Tool Box's sole claim on appeal is that denial of the building permit violated the First Amendment because the Restrictive Covenants grant such unbridled discretion to the City as to constitute a prior restraint on expression.

-5-

The legal issue before us can best be understood by initially discussing what is not at issue on appeal.

First, perhaps surprisingly, Tool Box has not challenged the specific decision by the City to prevent it from opening a nude-dancing club. Nude dancing is constitutionally protected expressive conduct. *See Barnes v. Glen Theatres, Inc.*, 501 U.S. 560, 566 (1991) ("[N]ude dancing . . . is expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so."). Tool Box might therefore have rested its claim on the allegation that the City denied it a building permit in order to prevent expression that the City found offensive—in other words, that the purpose of the building-permit denial was to stifle the expressive conduct of nude dancing. *See, e.g., Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668 (1996) (county cannot refuse to renew contractor's trash-hauling contract in retaliation for criticism of the county). But Tool Box is not pursuing such a claim.

Second, Tool Box does not challenge the Protective Covenants under the four-part test of *United States v. O'Brien*, 391 U.S. 367 (1968). Courts use this test when someone claims that application of a law has infringed on the person's freedom of speech, but "the governmental purpose in enacting the [law] is unrelated to the suppression of expression." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000). A law passes muster under *O'Brien* if (1) the law "is within the

-6-

constitutional power of the government to enact," *id*. at 296; (2) the law "furthers an important or substantial government interest," *id*.; (3) "the government interest is unrelated to the suppression of free expression," *id*. at 301; and (4) "the restriction is no greater than is essential to the furtherance of the government interest," *id*.  For example, the Supreme Court has employed the *O'Brien* test to reject a Vietnam War protester's challenge to the law prohibiting the burning of draft cards, *O'Brien*, 391 U.S. at 382, and to reject a nude-dancing establishment's challenge to a law banning all public nudity.  *Pap's A.M.,* 529 U.S. at 296-302.  The district court found that the Protective Covenants satisfy the *O'Brien* test.

Nor does Tool Box challenge the Protective Covenants as a time-place-and-manner restriction on speech.  Because the covenants were used to prohibit a nude-dancing establishment, they might be characterized as a law that, while not outright banning such establishments from the City, excludes them from a particular portion of town—the Industrial Park.  (Indeed, the Mayor ruled that "the Protective Covenants do not allow for a sexually oriented business use." App. at 44.)  Content-neutral time-place-and-manner restrictions are constitutional if "they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47 (1986).  The Supreme Court has

-7-

held that city ordinances limiting the locations of adult-film theatres for the purpose of avoiding their secondary effects (effects which can be summarized as urban blight, *see id.* at 47-51), rather than for the purpose of regulating the content of the films, are content-neutral, *id.* at 47-49, and can be constitutional as time-place-and-manner restrictions. *Id.* Whether the Protective Covenants pass muster in this regard is not before us.

What *is* before us is a claim by Tool Box that the Protective Covenants act as a prior restraint that constitutes unconstitutional censorship. The Supreme Court has held that in certain circumstances a licensing scheme that confers excessive discretion on public officials may be treated as a form of censorship. *See, e.g.*, *Cox v. Louisiana*, 379 U.S. 536, 557 (1965). Tool Box contends that the Protective Covenants provide such a vague standard regarding what is prohibited in the Industrial Park that they confer the sort of excessive discretion barred by Supreme Court precedent. We disagree.

To see why this contention fails, it is necessary to examine why the grant of excessive discretion in a licensing scheme can be important to First Amendment interests. The Supreme Court's most extensive exposition of the matter appears in *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988), written by Justice Brennan for a 4-3 majority, which struck down a municipal ordinance governing the placement of newspaper racks on city property. The Court said,

"[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* at 757. It then noted two "identifiable risks to free expression" engendered by a grant of excessive discretion. The first risk is self-censorship. As the Court wrote:

> [T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. . . . Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship.

*Id*. at 757-58.

The second risk arises because the grant of wide discretion in a law increases the difficulty of determining whether a particular application of the law was the "licensor's legitimate denial of a permit" or the licensor's "illegitimate abuse of censorial power." *Id*. at 758.

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression. . . . In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the case-by-case nature of "as-applied" challenges render the licensor's action in large measure effectively unreviewable.

*Id*. at 758-59.

When these risks are sufficiently great, the remedy is to strike the licensing law in its entirety. The licensing law cannot be applied to anyone. As in *Lakewood*, a person subject to the law will prevail on a prior-restraint claim without having to prove that a license had been or would be denied as a result of the person's past or anticipated speech or expressive activity.

Of course, such invalidation of a licensing scheme carries with it a cost. Providing officials with discretion is not an unmitigated evil. Rather than requiring the City Attorney to spend weeks trying to draft covenants that address every possible use of property in the Industrial Park, it may be the better part of wisdom to speak in more general terms of the park's purpose and count on City officials to exercise sound discretion in furtherance of that purpose. No law can anticipate every eventuality. Even judges complain about being denied discretion when a law does not allow for exceptions in circumstances they believe to be exceptional (as with the present controversy regarding sentencing guidelines). *Cf. Virginia v. Hicks*, 123 S. Ct. 2191, 2197 (2003) (overbreadth doctrine creates "substantial social costs . . . when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct").

Accordingly, the Supreme Court in *Lakewood* made clear that not every grant of licensing discretion must be struck down. Although censorship risks are

-10-

theoretically present in any licensing law granting broad discretion, the Court was concerned only with those licensing schemes most likely to be in fact an instrument of censorship. It recognized that protection of First Amendment freedoms does not require permitting unbridled-discretion challenges to all licensing laws. After discussing the problems that can be generated by licensing laws, the Court wrote:

> This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject. The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

*Lakewood*, 486 U.S. at 759. Examples of licensing laws with such a nexus are laws governing charity solicitation, parade permits, film censorship, and regulation of handbills, leaflets, or sound trucks. *Id*. at 756 n.6.

The Court later described laws that do not have the requisite "nexus to expression, or to conduct commonly associated with expression":

> In contrast to the type of law at issue in this case, laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship.

*Id*. at 760-61. Of particular interest to the case before us, the *Lakewood* Court provided a specific illustration of a licensing law not subject to a challenge for granting excessive discretion:

-11-

For example, a law requiring building permits is rarely effective as a means of censorship. To be sure, on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse. And if such charges are made, the general application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision.

*Id*. at 761.

Applying this framework to the Protective Covenants, we determine that they lack the requisite nexus and are exempt from a First Amendment challenge that they permit unbridled discretion. They constitute a law of "general application," *id*. at 760; they apply to every business that seeks to locate in the Industrial Park. The Protective Covenants are "not aimed at conduct commonly associated with expression," *id*. at 760-61; they are aimed generally at all features of a business that are conducive, or detrimental, to the advancement of a vigorous center of business development. Indeed, Tool Box concedes in its opening brief "that the covenants themselves were [not] designed to prevent [it] from conducting expressive activities." Aplt. Br. at 16.

Nor are there any provisions in the Protective Covenants that "permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken." *Lakewood*, 486 U.S. at 761. Perhaps one could say that the covenants are vague enough that they could be used to deny a license (a

-12-

building permit) because of ongoing or anticipated expression. But that is not what the *Lakewood* Court meant by the quoted language. After all, the Court was describing *which types* of licensing laws granting unbridled discretion are the ones that pose a particular threat to First Amendment interests and are therefore subject to challenge on that ground. The Court's discussion would have served no purpose if a law is subject to such challenge whenever it grants broad discretion. Indeed, the Court explicitly excluded from such challenge a building-permit law, even though the law's broad grant of discretion could enable the city to censor "an unpopular newspaper seek[ing] to build a new plant." *Id*. at 761. The Court reasoned that an as-applied challenge would protect First Amendment rights adequately in such an instance. Hence, when the Court refers to licensing laws that "permit" decisions to be made on the basis of expression, it must be referring to laws that by their explicit language affirmatively permit expression-based decisions. There is no such language in the Protective Covenants.

Moreover, prior application of the Protective Covenants provided precisely the feature referred to in *Lakewood* as making as-applied First Amendment review effective. The Court wrote that if there is a charge of misuse of a law requiring building permits, then "the general application of the statute in areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision," *id*. at 761, thereby making an

-13-

unbridled-discretion challenge unnecessary for the protection of First Amendment rights. Here, there was such a yardstick. Indeed, if Tool Box had pursued an as-applied challenge to the denial of its building permit, it could have offered in support of its claim the City attorney's opinion on the applicability of the Protective Covenants to the Tool Box proposal. Nothing prevented Tool Box from bringing an as-applied challenge to the Mayor's decision; it simply chose not to.

**Conclusion**

We therefore conclude that the Protective Covenants do not create an unconstitutional prior restraint. Because Tool Box raises no other argument on appeal, we VACATE the panel decision and AFFIRM the district court's judgment.

01-4134, *Tool Box v. Ogden City Corp* .
**PORFILIO** , Senior Circuit Judge, dissents.

I respectfully dissent.  I believe the panel properly decided the case,        *Tool Box v. Ogden City Corp* ., 316 F.3d 1167 (10th Cir. 2003), and nothing in the majority en banc opinion changes my mind.  I adhere to the analysis wisely set forth by Judge Aldisert.  Nonetheless, I have some additional observations prompted by the en banc review.

I have difficulty understanding the court's contention that Tool Box has not challenged the Protective Covenants on an "as applied" basis.  Although the City has continually argued this position, my recollection is that at every junction of this appeal, including oral argument before the en banc court, counsel for Tool Box made clear his client's claim was based on two grounds.  One was a facial challenge, but the other was that the Covenants were invalid as they were applied to Tool Box.

Indeed, it was upon the "as applied" basis that Tool Box filed the motion for partial summary judgment which provoked the ultimate resolution of this case in the district court.    *Id.* at 1173.  In analyzing this claim for the panel, Judge Aldisert refined the controversy by pointing out:

> The protective covenants do not incidentally impact protected speech
> but merely *permit* such impact through the discretion of the Review
> Board and the Mayor, the district court erred in considering the
> protective covenants under the    *O'Brien* test.

***Id.*** at 1179 (emphasis in original) ( *citing* ***United States v. O'Brien***, 391 U.S. 367 (1968)).

Facially, the Covenants do not imply an attempt to regulate speech. In very general terms, they describe permissible uses of the property within the industrial park. Certain conditions, such as fire hazards, noise, "vibrations which will injure the reputation of said premises of the neighboring property," are forbidden. Also prohibited is "any use which is in violation of the ordinances of Ogden City and the laws of the State of Utah." In particular, however, the Covenants are silent on whether a sexually oriented business falls within or without their reach. The majority takes comfort, then, in the "general application" of the Covenants which permits the court to avoid a challenge to the patent unbridled discretion vested in the Board and the Mayor. I do not believe that comfort is warranted.

Generally "laws that are not aimed at conduct commonly associated with expression" will not give rise to a charge of censorship. ***City of Lakewood v. Plain Dealer Publ'g Co.***, 486 U.S. 750, 760-61 (1988). Yet, the majority has overlooked the exception to this rule. Indeed, as the Court has distinguished:

> [A] law requiring building permits is rarely effective as a means of censorship. To be sure, *on rare occasion an opportunity for censorship will exist,* such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse. *And if such charges are made, the general application of the statute to areas unrelated to expression will provide the courts*

*a yardstick with which to measure the licensor's occasional speech-related decision .*

**Id**. at 761 (emphasis added).

This case presents one of the instances in which a charge has been made that a "licensor" has applied a facially neutral law to deny protected expression. Hence, whether Tool Box has presented a facial or an as applied attack, or whether the Covenants are written in language of general applicability, does not govern the outcome of this case. Under either attack, the Court has acknowledged the claim of censorship can be made. **Id**.

That the City made its decision on the basis of protected speech is not even in controversy here. Nude dancing is protected expression, even if marginally so. Additionally, an analysis of the Covenants themselves underscores that the Tool Box permit was denied because the ruling officials believed, without statutory direction, nude dancing is not "wholesome."

Following those stark points, I look first to the fact the Covenants state their purpose is to "create a *wholesome environment* for the conduction [sic] of selective manufacturing and marketing enterprises." (emphasis added). It should be significant, therefore, that when this purpose was adopted, the conduct of a sexually oriented business was both a use permitted within the industrial park by a specific ordinance and was not a violation of any other of the City ordinances. Thus, I presume when the drafters of the Covenants adopted the wholesomeness

-3-

test, they had to have known a sexually oriented business was lawfully permitted within the industrial park.

Next, neither the Board, the Mayor, nor the majority of this court cites any specific language in the Covenants to show how the use proposed by Tool Box was not permitted. Although each points to generalized justifications, nothing within the text of the Covenants makes the proposed use by Tool Box a violation of those general terms. Indeed, the Covenants are silent on sexually oriented businesses all together. Yet, the basis for the Board's decision and the ruling of the Mayor was that Tool Box's proposed use would not comport with the need to create a "wholesome environment," and that it "conflicts with those types of business [sic] which are defined as 'allowed uses' and which advance the purposes for which the industrial park was established." But how the connection was made between the proposed use and a violation of the Covenants is not explained by either the Board, the Mayor, or the majority.

The Covenants do not define "wholesomeness" nor do they even suggest nude dancing is not "wholesome." Nonetheless, the Board and the Mayor decided such is the case. Under these Covenants, the determination of what is wholesome and what is not is left to the unfettered determination of the Board and the Mayor. Yet, despite the protected status of nude dancing, which the majority concedes, it

-4-

appears nude dancing is unwholesome and repugnant in the City of Ogden because the Board simply said so.

The same can be said for the other reason the Board denied the Tool Box application. In what way does nude dancing conflict with the other businesses in the industrial park? Tool Box would not violate any of the named conditions the Covenants provide as impermissible business conduct. Nothing in the record suggests it would be a fire hazard, or would be "noisy," or create illicit "vibrations" that would "injure the reputation" of other property owners. It must be, then, that the decision of the Board was based solely upon its own notions of "wholesomeness."

Moreover, there is nothing before us to suggest the enforcement of the Covenants was for any purpose other than to stifle protected expression. Although the majority alludes to "the 'content-neutral' purpose of limiting the secondary effects" of nude dancing, there is nothing in the record to suggest that purpose was actually pursued.

For these reasons, as well as those set forth in the panel opinion, I must dissent. I disagree Tool Box "cannot" properly challenge the "improper purpose of stifling expression protected by the First Amendment." Maj. Op. at 14. While not an advocate of the values of nude dancing personally, I still find censorship by

subterfuge constitutionally repugnant.  I would reverse the holding of the district court.