FILED
United States Court of Appeals
Tenth Circuit

June 24, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

GEORGE WITTNER, parent and next friend to Decedent, Ian Wittner; LIZBETH CARDENAS, parent and next friend to Decedent, Ian Wittner, and as Personal Representative of the Estate of Ian Wittner,

       Plaintiffs-Appellants/
       Cross-Appellees,

v.

BANNER HEALTH, an Arizona nonprofit organization, d/b/a North Colorado Medical Center; ROBERT GEORGE RUEGG, M.D., SUSAN J. PONDER, R.N.,

       Defendants-Appellees/
       Cross-Appellants.

Nos. 11-1171 & 11-1180

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:09-CV-00610-RPM)**

Jordan Factor of Allen & Vellone, P.C., Denver, Colorado (Daniel P. Gerash and Eric L. Steiner of Gerash & Steiner, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellants/Cross-Appellees.

Traci L. Van Pelt (Matthew C. Miller and Jennifer L. Ward with her on the briefs) of McConnell Fleischner Houghtaling, LLC, Denver, Colorado, for Defendants-Appellees/Cross-Appellants.

Before **KELLY**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Ian Wittner died at the North Colorado Medical Center after being injected with the drug Haldol during a seventy-two-hour involuntary mental health hold. His parents, Lizbeth Cardenas and George Wittner, brought this § 1983 claim against the Medical Center, the doctor, and the nurse involved in their son's treatment. They appeal from the district court's grant of summary judgment to defendants and its subsequent denial of their FED. R. CIV. P. 59(e) motion to retain jurisdiction over their state law tort claims. Defendants cross-appeal the district court's denial of their FED. R. CIV. P. 12(b)(6) motion to dismiss the § 1983 claim for lack of state action. Because we conclude that defendants are not state actors for purposes of § 1983, we vacate the order of summary judgment, reverse the district court's denial of defendants' Rule 12(b)(6) motion, affirm the court's denial of plaintiffs' Rule 59(e) motion, and remand with instructions to enter judgment for defendants consistent with this opinion.

## I.

On April 4, 2008, police officers in Greeley, Colorado took Ian Wittner to the North Colorado Medical Center (NCMC) for a mental health evaluation after

Ian made threats against his former employer. A physician at NCMC concluded that Ian was likely mentally ill and posed an imminent danger to himself or others and, pursuant to COLO. REV. STAT. § 27-65-105, ordered that Ian be held at NCMC's Behavioral Health facility for a seventy-two hour evaluation and treatment (an "involuntary hold").

During the second day of the involuntary hold, Ian had a violent outburst at the nurses' station. Five or six staff members grabbed Ian and carried him into his room, where they placed him on his bed and began to apply five-point restraints (straps around his wrists, waist, and both ankles). After hearing a nurse describe the situation over the phone, the on-duty psychiatrist, defendant Dr. Robert Ruegg, ordered that Ian be medicated with four milligrams of Ativan (a sedative) and ten milligrams of Haldol (an antipsychotic). Defendant Nurse Susan Ponder prepared the syringes and went to Ian's room. Ian was fully restrained, but continued to scream and thrash against the restraints. Nurse Ponder administered the medications. A few minutes later, Ian went into cardiac arrest. He was transferred to NCMC's emergency unit and then to the ICU. His parents agreed a few days later to the removal of life support, and Ian died on April 9, 2008.

Ian's parents filed suit under 42 U.S.C. § 1983 in federal district court, naming as defendants Banner Health (the owner of NCMC), Dr. Ruegg, and Nurse Ponder. Plaintiffs claimed that defendants violated Ian's due process rights under

the Fourteenth Amendment by injecting him with Haldol before waiting to see whether the restraints and Ativan would suffice. Plaintiffs also asserted several Colorado state law tort claims, including wrongful death and medical malpractice.

All defendants moved to dismiss under Rule 12(b)(6), contending plaintiffs could not state a § 1983 claim against them because they were not state actors. The district court concluded that defendants were state actors, and the case proceeded to discovery. In their summary judgment motion, defendants did not reprise their state action argument but asserted instead that the individual defendants – Dr. Ruegg and Nurse Ponder – merited qualified immunity, that the Medical Center was not liable because there is no constitutional right to be free from injection of antipsychotic drugs in a violent emergency, and that the Medical Center's policies encourage using the least intrusive means of restraint in any event. Plaintiffs responded by arguing that the constitutional right not to be injected with Haldol was so clearly established as to trump qualified immunity, that no emergency existed once Ian Wittner had been fully restrained, and that NCMC's policies encourage using involuntary drug administration as a first, not last, resort.

At the hearing, the district court granted defendants' summary judgment motion from the bench. While the transcript does not illuminate the exact basis for the court's ruling, it apparently rejected plaintiffs' contention that no emergency existed at the time of the injection and agreed with defendants'

-4-

characterization of NCMC's drug injection policies. The court also accepted the individual defendants' qualified immunity defense. It dismissed without prejudice plaintiffs' state law claims for lack of jurisdiction.

Plaintiffs filed a Rule 59(e) motion requesting that the district court amend the judgment to retain supplemental jurisdiction "for the sole purpose of remanding the state law claims to Weld County District Court . . . [as] Plaintiffs would be unduly prejudiced if this Court's decision to decline supplemental jurisdiction over the state law claims . . . operated to bar the claims from being heard by a state tribunal."[1] Aplt. App. at 54-55. The court denied plaintiffs' motion, holding there was no basis for remand of an action that had not been removed from state court.

Plaintiffs appeal the grant of summary judgment and the denial of their Rule 59(e) motion. Defendants cross-appeal the denial of their Rule 12(b)(6) motion.

## II.

### *Background and Statutes*

A § 1983 claim requires a plaintiff to show both the existence of a

---

[1] Plaintiff filed the present action in federal court. At some point, they also filed a medical negligence action in Colorado state court, arising out of the same facts. In their Rule 59(e) motion, they asked the district court to "remand" the state law claims they raised in this action to the state court action they had separately filed.

federally-protected right and the deprivation of that right by a person acting under color of state law.  42 U.S.C. § 1983; *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).  Here, the Rule 12(b)(6) dispute centered on whether the private hospital and privately employed defendants were "state actors" who could be held liable for a constitutional violation, assuming there was one, under § 1983.

The Amended Complaint set out the legal framework governing involuntary psychiatric holds in Colorado, and plaintiffs sought to persuade the district court that this statutory scheme makes private mental health facilities and personnel "state actors" when they agree to hold and treat a patient pursuant to state law. Colorado law provides as follows:

> When any person appears to have a mental illness and, as a result of such mental illness, appears to be an imminent danger to others or to himself or herself . . . then a [police officer, doctor, psychologist, and certain other professionals with appropriate training] . . . upon probable cause and with such assistance as may be required, may take the person into custody, or cause the person to be taken into custody, and placed in a facility designated or approved by [the Colorado Department of Human Services] for a seventy-two-hour treatment and evaluation.

COLO. REV. STAT. § 27-65-105(1)(a)(I) (2012).[2]  An average citizen may initiate the same process by going before a judge.  *Id*. § 27-65-105(1)(b).

Under Colorado law, medical facilities are not required to admit persons believed to be an imminent danger.  *Id.* § 27-65-105(4).  Indeed, medical facilities

---

[2]      In 2008, when Ian was taken to NCMC, this provision was codified at COLO. REV. STAT. § 27-10-105.

-6-

are not allowed to admit such a person until they obtain "an application in writing" from the person invoking the involuntary commitment procedure (*e.g.*, a police officer bringing in a potential patient). *Id.* § 27-65-105(3). "If the seventy-two-hour treatment and evaluation facility admits the person, it may detain him or her for evaluation and treatment for a period not to exceed seventy-two hours . . . ." *Id.* § 27-65-105(4).

After reciting these Colorado laws, plaintiffs alleged the following facts relevant to the state action inquiry:

- Defendant Banner Health, doing business as NCMC, is an Arizona nonprofit corporation with its principal office address in Greeley, Colorado. Aplt. App. at 15.

- NCMC is a "designated facility" to which Colorado police may take persons thought to be an imminent risk to themselves or others. *Id.* at 17.

- As a private "designated facility," NCMC must "consent . . . to the enforcement of standards set by the executive director [of the state Department of Human Services]." *Id.* at 17, quoting COLO. REV. STAT. § 27-10-105(1)(b) (now codified at § 27-65-105(1)(b)).

- The executive director of the state Department of Human Services establishes standards for "designated facilities" in consultation with an advisory board that "oversees the designated facilities." *Id.*

- NCMC "is compensated by the state and/or the City of Greeley" for serving as a "designated facility." *Id.*

- NCMC is the only "designated facility" the Greeley police department uses for involuntary holds of mentally ill persons. *Id.* at 17-18.

- NCMC has the authority to determine whether or not to detain a person brought there by the police. *Id.* at 18.

- On April 4, 2008, Ian Wittner was put in a police car by Greeley police officers and taken to NCMC. *Id.* at 16.

- An NCMC doctor issued "holding orders" authorizing Ian's detention. *Id.* at 19.

- On April 5, 2008, when Ian started acting aggressively at NCMC, he was injected with Haldol and Ativan by defendant Nurse Ponder at defendant Dr. Ruegg's instruction after being put in five-point restraints. *Id.*

- Defendants Ruegg and Ponder are employees of NCMC. *Id.*

- The State of Colorado exerts some amount of supervisory control over NCMC by overseeing the administration of medication, requiring NCMC to keep certain records, developing training curricula and evaluations for NCMC staff, and retaining the power to "monitor" medications given at NCMC to detained persons.

*Id.* at 18-19.

Plaintiffs did not contest NCMC's status as a private hospital nor the individual defendants' status as a privately employed doctor and nurse, and there was no dispute regarding the events that led to Ian Wittner's involuntary hold at NCMC. Notably, plaintiffs did not name the police officer, the police department, or the admitting physician as defendants.

Plaintiffs' state action theory, as set out in the complaint, hinges entirely on the state statutory scheme allowing seventy-two-hour involuntary mental health holds and NCMC's role thereunder as a "designated facility." Plaintiffs contend the state of Colorado transformed the medical facility and its health care employees into state actors by assuming the power to authorize the involuntary

-8-

commitment of mentally ill persons and delegating that power to designated facilities which the state regulates. In so doing, plaintiffs argue, the state assumed the duty to provide constitutionally adequate medical care for the involuntarily committed patient, and NCMC and its employees acted under color of state law when it contracted to perform the state's obligation of care.

The district court accepted plaintiffs' state action argument. Ruling from the bench at the Rule 12(b)(6) motion hearing, the court reasoned that "[t]he fact of the matter is [Ian was] hauled there by the police department. The doctor gets him and treats him apparently because he's in custody." Aple. Supp. App. vol. 1 at 73. "He's exercising authority of the State of Colorado." *Id.* at 74. "This scheme that Colorado has is a matter of taking somebody, putting them in the hands of a medical provider, all involuntary. That medical provider is exercising an authority given to him by the State of Colorado, not by the plaintiff or the decedent." *Id.* at 75.

### *Standard of Review*

We review the district court's disposition of a Rule 12(b)(6) motion *de novo*. *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009). When deciding whether a complaint states a claim that can survive a Rule 12(b)(6) motion, "we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Id.* But the complaint must contain "sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted), and we are not "bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Like the district court, we consider only the facts alleged in plaintiffs' Amended Complaint in reviewing the motion. *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

## *Analysis*

Where a litigant seeks to hold a private actor accountable as a state actor for constitutional deprivations, we have applied various analyses and referred to them as the "nexus test," the "public function test," the "joint action test," and the "symbiotic relationship test." *Johnson v. Rodrigues*, 293 F.3d 1196, 1202-03 (10th Cir. 2002) (citing *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442 (10th Cir.1995)). The facts alleged here do not establish state action under any of these tests.

### *1. Nexus Test*

One way private actors can become state actors for § 1983 purposes is if the state exercises sufficient "coercive power" over the challenged action. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) (internal quotation marks omitted). We called this type of state action analysis the "nexus" test in *Gallagher*, 49 F.3d at 1448, while other circuits have called it the "compulsion"

test.  *See*, *e.g.*, *Lansing v. City of Memphis*, 202 F.3d 821, 829 (6th Cir. 2000). The test is derived from *Blum*, 457 U.S. at 1007-08, in which the Supreme Court held that privately run nursing homes were not state actors when medical staff decided to move Medicaid patients to lower levels of care.  *Id.*  The Court held that notwithstanding substantial entanglement with state rules and state funding, the challenged action was not state action because the ultimate clinical decision was made by "the physician, and not the forms [required by the state]."  *Id.* at 1006.  Accordingly, cases that follow *Blum* ask whether the challenged activity "results from the State's exercise of coercive power."  *Brentwood*, 531 U.S. at 296 (internal quotation marks omitted).

We applied this analysis in *Pino v. Higgs*, 75 F.3d 1461 (10th Cir. 1996), where we held that a privately employed doctor who authorizes a short-term involuntary psychiatric hold at a private hospital pursuant to a state involuntary commitment scheme was not a state actor because the requisite level of coercive power was not present.  *Id.* at 1465-66.  The plaintiff in *Pino* was taken by police to a private hospital, where a privately employed doctor was legally able to certify her for a short-term mental health hold only because of the New Mexico authorizing statute.  *Id.* at 1466.  We had no trouble concluding that the actions of the police officers in detaining the plaintiff and taking her to the hospital were "taken under color of state law."  *Id.* at 1464.  But the private hospital and staff members were not transformed into state actors simply because they had acted in

-11-

ways the law allowed them to. We explained that while the New Mexico statutory scheme enabled the examining doctor to order the plaintiff detained involuntarily, the doctor's decision was not "fairly attributable to the state" because the state did not pressure or coerce the doctor into making his decision to certify that the plaintiff be involuntarily held. *Id.* at 1466.

The New Mexico statute at issue in *Pino* provided that the admitting physician or psychologist "shall evaluate whether reasonable grounds exist to detain the proposed client . . . and if such reasonable grounds are found, the proposed client shall be detained." *Id.* at 1466 (quoting N.M. STAT ANN. § 43-1-10(E)). Notwithstanding the mandatory "*shall* be detained" language, we concluded that

> the state has no authority and cannot require the admitting doctor to examine such a "proposed client" anymore than it could require the examination of any other person who appeared at the emergency room. Thus, Dr. Weiss' actions in admitting Appellant to Socorro General were those of a private physician not "state action."

*Id.* at 1466.

The Colorado statute here lacks the mandatory language of the New Mexico law; it merely says "[i]f the seventy-two-hour treatment and evaluation facility admits the person, it *may* detain him or her for evaluation and treatment for a period not to exceed seventy-two hours . . . . ." COLO. REV. STAT. § 27-65-105(4) (emphasis added). The Colorado law on its face thus provides less support for a "compulsion" argument than the New Mexico law in *Pino* did. And like New

Mexico, Colorado has no ability to force, compel, or even encourage a private facility to admit anyone. Nor does Colorado law influence the type of medication given to involuntarily committed patients. When the state regulates a private medical facility but does not mandate its employees to make particular decisions regarding patient care, "[w]e cannot say that the State . . . is responsible for the physician's decision." *Pino*, 75 F.3d at 1466 (citing *Blum*, 457 U.S. at 1006-07). Without more, therefore, a statutory grant of authority for a short-term involuntary hold in a private hospital does not pass the nexus/compulsion test for turning private action of the hospital or the certifying doctor into state action.

Plaintiffs have offered no relevant facts to distinguish this case from *Pino*. Although they alleged that state agencies set standards for NCMC, require NCMC to keep certain records, can give training to NCMC staff, and can order re-training, Aplt. App. at 18-19 (citing COLO. REV. STAT. §§ 25-1.5-302 and 25-1.5-303), they did not allege that these rules have any kind of coercive effect on the decisions of individual hospital personnel. The laws cited are merely generic regulations that do not transform the private actor into the state. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974). Nor does the allegation that NCMC receives state funding create state action when there was no allegation that the state uses its funding to coerce NCMC into giving particular medications to particular patients. Without a showing of coercion, even "substantial [state] funding of the activities of a private entity is no more persuasive than the fact of

-13-

regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business." *Blum*, 457 U.S. at 1011.

Decisions that "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State" are not decisions we can fairly attribute to the state. *Blum*, 457 U.S. at 1008. Here, the requisite level of state "coercive power" over the decision to give Haldol to Ian Wittner is absent.

*2. Public Function Test*

But compulsion is not the only route to state action. The "public function" test asks whether the challenged action is a traditional and exclusive function of the state. *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 157-58 (1978). "This test is difficult to satisfy. While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Gallagher,* 49 F.3d at 1456 (citations and internal quotation marks omitted). In *Spencer v. Lee,* 864 F.2d 1376, 1377 (7th Cir. 1989), and *Harvey v. Harvey*, 949 F.2d 1127, 1130-31 (11th Cir. 1992), both of which we relied on in *Pino,* the Seventh and Eleventh Circuits applied the public function test in deciding that involuntary commitment in a private hospital was not state action. The court in *Spencer* reviewed the history of involuntary commitment of the mentally ill and concluded that committing mentally ill persons had never been an exclusive public function

in Anglo-American law or under the law of Illinois.  Instead, care of the mentally ill was traditionally provided in "private custody" by "friends and relations." *Spencer,* 864 F.2d at 1380-81 (citing Blackstone).

Plaintiffs cite to some out-of-circuit district court decisions finding involuntary commitment of the mentally ill to be a public function and thus state action. But this view has been rejected in our circuit.  *Pino,* 75 F.3d at 1467 (rejecting state action "for reasons similar to the reasons discussed in [*Spencer* and *Harvey*] . . . .").  Plaintiffs offer no facts regarding the history of mental-health commitment in Colorado to compel a different conclusion here.

*3.  Joint Action Test*

Lacking compulsion or a public function, a private actor can still be transformed into a state actor under the "joint action" test, in which we ask "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher*, 49 F.3d at 1453.  In *Gallagher*, a state university leased university facilities to a private company to hold a concert on campus.  The plaintiffs challenged certain actions taken by concert security guards employed by the company, contending the guards were safeguarding public property.  The university had general requirements that security must be provided, but was silent regarding the specific type of security to be provided by lessees.  We held that "[t]his silence establishes no more than the University's acquiescence in the practices of the parties that leased the [facilities]

and is insufficient to establish state action under the joint action test." *Id.* at 1455.

Plaintiffs have not alleged that any state officials conspired with or acted jointly in making the decision to medicate Ian Wittner with Haldol. Instead, plaintiffs' theory of state action seems to be one of acquiescence – that by allowing NCMC to hold Ian, the state should be held responsible for an NCMC doctor's decision to medicate him. But "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). Accordingly, the "joint action" test is not satisfied on the facts alleged here.

*4. Symbiotic Relationship/Entwinement*

In *Gallagher*, applying the "symbiotic relationship" test, we said that when "the state 'has so far insinuated itself into a position of interdependence' with a private party 'it must be recognized as a joint participant in the challenged activity.'" 49 F.3d at 1451 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)).[3] Rather than "symbiotic relationship," the Supreme Court referred in *Brentwood* to "entwinement" between a private sports association and state agencies as a relevant factor in the state action analysis. *See* 531 U.S. at 296, 298. Instead of reading *Brentwood* as creating a new, fifth test for state

---

[3] The analysis in *Burton* was christened the "symbiotic relationship" test in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175 (1972).

-16-

action, we explained in *Johnson* that the Court's use of "entwinement" is "comparable to what [we] ha[ve] previously described as a 'symbiotic relationship.'" 293 F.3d at 1205.

Whether it is called "symbiotic relationship" or "entwinement," the analysis starts by asking whether and to what extent the state's relationship with the private actor goes beyond the "mere private [purchase] of contract services." *Brentwood*, 531 U.S. at 299. "Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity." *Gallagher*, 49 F.3d at 1453. But a public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities.

In *Brentwood*, the Court held that the Tennessee Secondary Schools Athletic Association (TSSAA) was not a mere private contractor because, *inter alia*, the state Board of Education supervised the TSSAA, resulting in state involvement with the private actor from the "top down," and the state public schools constituted the majority membership of the TSSAA, resulting in state involvement with the private actor from the "bottom up." 531 U.S. at 299-300. The Court also noted that the TSSAA acted more like a representative body for the public schools than an independent service provider.

Unlike mere public buyers of contract services . . . the schools here obtain

membership in the service organization and give up sources of their own income to their collective association. The Association thus exercises the authority of the predominantly public schools to charge for admission to their games; the Association does not receive this money from the schools, but enjoys the schools' moneymaking capacity as its own.

*Id.* at 299.

Plaintiffs urge us to analogize their case to another case with symbiotic relationship features, *Milonas v. Williams*, 691 F.2d 931, 940 (10th Cir. 1982), in which we held a private school for behaviorally challenged boys to be a state actor under *Burton* when it collaborated with state school districts, jails, and courts to admit students and accepted a large amount of state funding. *Id.* But the interdependence between the school and the state in that case went far beyond, both qualitatively and quantitatively, the interdependence between the state and NCMC alleged here. In *Milonas*,

> members of the class were placed at the school involuntarily by juvenile courts and other state agencies. . . . Detailed contracts were drawn up by the school administrators and agreed to by the many local school districts that placed boys at the school. There was significant state funding of tuition and, in fact, the school itself promoted the availability of public school funding. . . . There was extensive state regulation of the educational program. . . .

*Id.* Students could be placed in the school by order of state courts, *id.*, and the school was not just a school but also a "correctional and detention facility." *Id.* at 935.

Here, as we have discussed, the state lacks the authority to unilaterally place patients like Ian Wittner at NCMC; it merely authorizes NCMC to accept

-18-

such patients if NCMC so chooses. Plaintiffs do not contend the state "extensively" participates in patient care, draws up "detailed contracts" for the care of patients, or dictates the medical "program." *Id.* at 940. The kind of heavily interdependent relationship present in *Milonas* and *Brentwood* has simply not been alleged here and is not supported by the Colorado statutes authorizing involuntary commitments limited to seventy-two hours. At best, "[a]ll of petitioner[s'] arguments taken together show no more than that [NCMC] was a heavily regulated, privately owned" facility, which elected to engage in the challenged action in a manner "permissible under state law. . . . [T]his is not sufficient to connect the State . . . with respondent's action so as to make the latter's conduct attributable to the State . . . ." *Jackson* 419 U.S. at 358. The symbiotic relationship test is not satisfied.

Plaintiffs rely on *Brentwood* in urging us to reject these discrete "tests" in favor of a more fact specific inquiry. The Supreme Court emphasized in *Brentwood* that "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient . . . ." 531 U.S. at 295. But we have long adhered to that very principle. In *Gallagher*, we recognized the need to take a "flexible approach to the state action doctrine . . . [which considers] the facts of each case." 49 F.3d at 1447. And while *Brentwood* supports finding or rejecting state action when it would be pragmatic or normative to do so, which might sometimes require

abandoning a rigid test, 531 U.S. at 304, *Brentwood* did not radically revise state action doctrine or call into question any of the "tests" we discussed in *Gallagher*. In fact, *Brentwood* reviewed those tests approvingly, simply replacing the word "test" with terms like "criteria," "set[s] of circumstances," and "kinds of facts." *See id.* at 303 ("'Coercion' and 'encouragement' are like 'entwinement' in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead."). Because *Brentwood* did not disturb any of the "tests" (or "criteria") we identified in *Gallagher*, we see no reason to abandon them. Nor does a more fact specific inquiry help plaintiffs, given the striking similarities between this case and *Pino*, 75 F.3d 1461.

Plaintiffs proffer their own three tests, which are all inaccurate or inapplicable statements of law. They first claim that "when a state assumes the power to deprive its citizens of fundamental constitutional rights, the state may not, merely by delegating the exercise of such power to a nominally private entity, divest its citizens of the means to vindicate those rights." Aplt. Third Br. at 39. Plaintiffs rely for this position on *West v. Atkins*, 487 U.S. 42 (1988), which held that private physicians who contracted to work in state prisons could be subjected to § 1983 liability for Eighth Amendment violations. Plaintiffs make much of the fact that *West* did not mention the "public function," "compulsion," "joint action," or "symbiotic relationship" tests by name, but that is immaterial. *See Brentwood,* 531 U.S. at 303. *West* is at its core a public function case. *See*

-20-

*id.* at 295 (citing *West* as a case involving "a public function . . . .").

Using public function reasoning, some courts have applied *West* to private *prisons*. *See Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) (quoting *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991)). But we and other circuits following *Spencer*, 864 F.2d 1376, have declined to import this "public function" label onto short-term involuntary mental health holds in private *hospitals*. *See Harvey,* 949 F.2d at 1131; *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254 (1st Cir. 1994). *West* anticipated *Brentwood*'s focus on all relevant quantitative and qualitative facts by supplementing its public function reasoning with joint action and symbiotic relationship analyses, finding it relevant that contracted doctors were not given unfettered discretion but were required to cooperate with state prison personnel. *West,* 487 U.S. at 56. But that does not help plaintiffs because the facts alleged here do not create a close question under any of the four tests.

Plaintiffs also argue that "[w]hen a state by statute assumes certain affirmative obligations and then delegates the fulfillment of those responsibilities to a private entity, the entity acts under color of state law." Aplt. Third Br. at 44. Neither premise embedded in this argument is supported here. First, we are not convinced that Colorado assumed the statutory "affirmative obligation" plaintiffs suggest: the duty to provide mental health care to everyone in the state. *Id.* The statute plaintiffs rely on to locate this putative obligation is COLO. REV. STAT.§

27-65-101. That is a general "Legislative Declaration" section, which provides that "subject to available appropriations, the purposes of this article are . . . [t]o secure for each person who may have a mental illness such care and treatment as will be suited to the needs of the person . . . ." COLO. REV. STAT. § 27-65-101(1). Without having cited any Colorado case law to support their theory, plaintiffs have not persuaded us that by means of such vague, hortatory language the state of Colorado imposed on itself an enforceable obligation to provide universal mental health care, especially given the "subject to available appropriations" proviso. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (explaining that even a statute instructing state employees to use "every reasonable means" in pursuit of a certain goal is not strong enough to create a "true mandate" subject to § 1983 liability for lack of enforcement). Second, even if Colorado had created a universal right to mental health care but then "delegated" its implementation to the private sector, such a "delegation" would not automatically make private actors state actors. Delegation does not create state action without at least one of the additional features described above: compulsion, a public function, joint action, or a symbiotic relationship. *Johnson*, 293 F.3d at 1202-03.

Finally, plaintiffs are incorrect that in the absence of a § 1983 claim they will have been "divest[ed] . . . of the means to vindicate [their] rights." Aplt. Third Br. at 39. They can still rely on state tort law, which has no qualified

-22-

immunity bar to surmount and may therefore be more favorable to plaintiffs than a § 1983 claim. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72-73 (2001) (explaining, in *Bivens* context, that state tort theories may be more plaintiff-friendly than constitutional torts).

Ultimately, none of plaintiffs' alternative state action theories convinces us to deviate from the path marked by *Pino.* We conclude plaintiffs failed to state a claim that defendants were state actors. Because we hold that the district court erred in failing to grant defendants' Rule 12(b)(6) motion to dismiss the § 1983 claim, we need not decide whether a Constitutional right to be free from the injection of Haldol in an emergency context existed or was clearly established.

**III.**

Plaintiffs also contend the district court abused its discretion when it denied their Rule 59(e) motion to amend the judgment to preserve jurisdiction over their state law tort claims and to remand them to state court. *Ysais v. Richardson*, 603 F.3d 1175, 1180 (10th Cir. 2010) (stating standard of review). We are not persuaded.

This case was originally filed in federal court seeking federal question jurisdiction over the § 1983 claim, and supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. Although it is within a district court's discretion to dismiss supplemental state law claims once it has dismissed the

-23-

federal question claim, we have said the court should consider retaining state claims when, "given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995) (citing *Thatcher Enter. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990)).

Plaintiffs make a fairness argument here, fearing their state law claims have expired under state limitations statutes. Their concern, however, is obviated by 28 U.S.C. § 1367(d), which provides: "[t]he [state] period of limitations for any claim asserted under [supplemental jurisdiction] . . . shall be tolled while the claim is pending [in federal court] and for a period of 30 days after it is dismissed . . . ." 28 U.S.C. § 1367(d). If plaintiffs filed their state court action within thirty days after the district court's dismissal, they should not face a statute of limitations bar in state court. Moreover, because this action was never filed in state court and removed to federal court, it cannot be "remanded" – only cases that have been removed from a given court can be remanded to that court. *See* 28 U.S.C. § 1447; *Allied Signal Recovery Trust v. Allied Signal, Inc.*, 298 F.3d 263, 270 (3d Cir. 2002) (citing *Bloom v. Barry*, 755 F.2d 356, 358 (3d Cir. 1985) ("Remand means 'send back.' It does not mean 'send elsewhere.'")). It was not an abuse of discretion for the district court to decline to retain supplemental jurisdiction over the state claims.

## IV.

Accordingly, we VACATE the district court's summary judgment order of March 22, 2011, REVERSE the court's order of September 29, 2009 denying defendants' Rule 12(b)6) motion, AFFIRM the court's denial of plaintiff's Rule 59(e) motion, and REMAND to the district court with instructions to enter judgment for defendant in accordance with this opinion.