**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THOMAS NEILSEN,

     Plaintiff - Appellant,

v.

MAGGIE M. MCELDERRY; JOHN AND
JANE DOE,

     Defendants - Appellees.

No. 19-1318
(D.C. No. 1:18-CV-01538-CMA-NRM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **MATHESON**, and **EID**, Circuit Judges.
_____

Thomas Neilsen, appearing pro se, appeals the district court's order granting

defendant Maggie M. McElderry's motion to dismiss his complaint under 42 U.S.C.

§ 1983 for alleged violations of his Fourth and Fifth Amendment rights, retaliation,

and conspiracy. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

# I. BACKGROUND

The events giving rise to Mr. Neilsen's suit took place while he was in the custody of the Colorado Department of Corrections serving a four-year sentence following his guilty plea to one count of sexual assault on a child and the entry of judgment on one deferred count when he attempted to withdraw his plea. At an October 2016 parole hearing, Mr. Neilsen denied committing any crimes against children and told the parole board he intended to pursue post-conviction relief to withdraw his plea. The parole board noted Mr. Neilsen's denial and ordered his mandatory release to parole the following year on the conditions that he present an adequate parole plan, designate a suitable parole sponsor, and establish adequate housing and work opportunities.

During the time leading up to his scheduled release on June 20, 2017, Mr. Neilsen met on several occasions with Ms. McElderry—his parole officer at the Crowley County Correctional Facility—to discuss his upcoming parole. Ms. McElderry presented Mr. Neilsen with a Parole Agreement, which included a requirement to "participate in a sex offender intake, evaluation and successfully complete treatment at the discretion of the Sex Offender Supervision Team." R. at 98.[1]

---

[1] Mr. Neilsen maintains that Ms. McElderry had no authority to require him to agree to participate in sex offender treatment because the parole board had not imposed such a condition. This argument is not relevant to any of his claims; instead, the relevant issue is whether the requirement—whether it was imposed by the board or Ms. McElderry—violated Mr. Neilsen's Fifth Amendment right against self-incrimination.

Mr. Neilsen alleged that throughout his meetings with Ms. McElderry, he told her he was seeking post-conviction relief to withdraw his guilty plea and "explained . . . that sex offender treatment would be incompatible with his right to [seek such] relief, [because] as part of treatment he would be required to admit guilt to a crime that he did not commit." R. at 6. Specifically, he told Ms. McElderry he was invoking his Fifth Amendment privilege against self-incrimination in refusing to sign the Parole Agreement. According to Mr. Neilsen, he "offered to correct . . . the mistakes"; however, Ms. McElderry refused and told him "the agreement . . . was not negotiable." *Id*. at 8. Further, Ms. McElderry was alleged to have said "she would not discuss legal issues," *id*., and did not allow Mr. Neilsen to meet with his community parole officer.

On June 20, Ms. McElderry refused to release Mr. Neilsen to parole; instead, she filed a complaint alleging Mr. Neilsen "violated [his obligation to] 'follow the directives of and cooperate with the Community Parole Officer.'" *Id*. at 9. As a result, Mr. Neilsen was detained for twenty-eight days before the complaint was dismissed and he was released to parole.

Mr. Neilsen sued and Ms. McElderry moved to dismiss on qualified immunity grounds. The magistrate judge recommended denial of Ms. McElderry's motion as to the retaliation and Fourth and Fifth Amendment claims and dismissal of the conspiracy claim. Ms. McElderry objected to the recommendations concerning the retaliation and Fourth and Fifth Amendment claims. The district court adopted the recommendation in part by dismissing the conspiracy claim but agreed with

3

Ms. McElderry that the retaliation and Fourth and Fifth Amendment claims should also be dismissed. This appeal followed.

## II. DISCUSSION

### A. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Because the focus is on whether the [defendant] had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). Therefore, "[w]hen a defendant raises the qualified-immunity defense, the plaintiff must . . . establish (1) the defendant violated a federal statutory or constitutional right and (2) the right was clearly established at the time of the defendant's conduct." *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020). The court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ullery*, 949 F.3d at 1291 (internal quotation marks omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts

4

must have found the law to be as the plaintiff maintains." *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (internal quotation marks omitted). "Although . . . caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate," and courts are cautioned "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

## B. Standard of Review

"This court reviews de novo a district court's grant of a motion to dismiss based on qualified immunity." *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010). "Asserting a qualified immunity defense via a [Fed. R. Civ. P.] 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).[2] Under our standard of review, "we accept as true all well-pleaded factual allegations in a complaint and view [them] in the light most favorable to the plaintiff," then determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wittner v. Banner Health*, 720 F.3d 770, 774-75 (10th Cir.

---

[2] The standard of review is more challenging because "[a]t [the motion to dismiss] stage, . . . the defendant's conduct *as alleged in the complaint* . . . is scrutinized for objective legal reasonableness[,] [whereas] [o]n summary judgment, . . . the plaintiff can no longer rest on the pleadings, and the court looks to the evidence before it . . . when conducting the [qualified immunity] inquiry." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (citation and internal quotation marks omitted).

5

2013) (internal quotation marks omitted). At the same time, "we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 775 (internal quotation marks omitted).

Whether there is a constitutional violation is a legal issue. *See United States v. Von Behren*, 822 F.3d 1139, 1145 (10th Cir. 2016) ("Determining whether an individual has properly [alleged the violation of a constitutional right] is a question of law, which we review de novo." (internal quotation marks omitted)). And whether the right is clearly established is also a question of law. *See Apodaca v. Raemisch*, 864 F.3d 1071, 1075 (10th Cir. 2017) (explaining that when the issue of "qualified immunity arises . . . on a motion to dismiss, . . . our decision regarding qualified immunity does not hinge on any factual disputes[, and] we confront a purely legal issue: whether the underlying constitutional right was clearly established").

## C. Fourth Amendment Claim

### 1. Neilsen's Complaint

For his Fourth Amendment claim, Mr. Neilsen alleged Ms. McElderry had him "illegally arrested" on June 20. R. at 5. More particularly, he maintained that because he was not yet a parolee when he was detained for failing to "follow the directives of and cooperate with the Community Parole Officer," *id.* at 9 (internal quotation marks omitted), he could not have committed the offense and the arrest was illegal. We are not required to accept as true Mr. Neilsen's allegation of an arrest because it is conclusory and involves purely a question of law. *See Apodaca*, 864 F.3d at 1075; *see also Von Behren*, 822 F.3d at 1145. The district court

6

determined there was no arrest and therefore no Fourth Amendment violation. We agree.

## 2. **Legal Principles**

The Fourth Amendment protects "[t]he right of . . . people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend IV. "An arrest, for purposes of the Fourth Amendment, is a seizure . . . ." *Romero v. Story*, 672 F.3d 880, 885 (10th Cir. 2012).

*Jenkins v. Currier*, 514 F.3d 1030 (10th Cir. 2008), is instructive and dispositive here. Briefly, at the time Jenkins was sentenced in Oklahoma state court he was also serving a federal sentence. The state court ordered Jenkins to begin serving his state sentences once he finished serving the federal sentence. But after finishing his federal sentence, Jenkins "was erroneously released to the street rather than being returned to Oklahoma custody to serve his state sentences." *Id.* at 1032. Months after his release from federal custody, Jenkins "was arrested without a warrant by Oklahoma state officials who evidently were aware that he had not completed his state sentences." *Id.* Instead of taking him before a judge or magistrate for a hearing, the state officials transferred him to a state correctional facility. Jenkins sued the state officials for violating his Fourth Amendment rights "when they took him into custody without a warrant or a probable cause hearing and transferred him to a correctional facility . . . to serve his previously imposed sentences." *Id.*

7

This court rejected Jenkins's claim, explaining that "[m]ost courts that have considered the Fourth Amendment implications of seizing a parole violator have held that a parolee remains in legal custody during the period of his parole and therefore . . . the retaking of a parole violator does not constitute an arrest for Fourth Amendment purposes." *Id.* at 1033. We extended this principle to others who are "subject to an unfinished sentence," stating they too are "not entitled to the full protections of the Fourth Amendment." *Id.*

### 3. **Analysis**

In applying *Jenkins*, the district court explained Mr. Neilsen "has put the cart before the horse. [Ms. McElderry's] refusal to release [him] was not an arrest for Fourth Amendment purposes. Whether [he] was a parolee or an incarcerated prisoner is irrelevant to the situation at hand [because he is still in legal custody]." R. at 165. We agree. Similarly, there is no authority to support Mr. Neilsen's argument that an incarcerated prisoner is arrested for Fourth Amendment purposes when a state actor causes him to remain in custody, regardless of the propriety of the underlying decision that results in continued incarceration. Last, because there was no arrest, Mr. Neilsen's argument that the arrest was made "without probable cause," Aplt. Opening Br. at 41, is irrelevant. Because we conclude there was no Fourth Amendment violation, we need not decide whether the law was clearly established.

**D. Fifth Amendment Claim**

   **1. <u>Neilsen's Complaint</u>**

Mr. Neilsen alleged he told Ms. McElderry he was invoking his right against self-incrimination as grounds for refusing to sign the Parole Agreement. We accept this factual allegations as true; however, we agree with the district court that Mr. Neilsen's other "conclusory statements must be disregarded," including his assertions that "sex offender treatment would be incompatible with his right to pursue post-conviction relief, [because] he would be required to admit guilt to a crime that he did not commit." R. at 154 (internal quotation marks mitted). Likewise, we are not required to accept as true Mr. Neilsen's allegations that the law was clearly established. *See Apodaca*, 864 F.3d at 1075; *see also Wittner*, 720 F.3d at 775.

Mr. Neilsen's theory of self-incrimination is based on a hypothetical scenario in which he prevails in his post-conviction proceedings and is allowed to withdraw his guilty plea to having sexually assaulted a child. "At that point, Neilsen [maintains he] faces the real prospect that the state may try to recharge [him] with new or original charges," Aplt. Opening Br. at 33, and then use the language in the Parole Agreement that he agreed to "participate in a sex offender intake, evaluation and successfully complete treatment," as evidence against him in a new prosecution. Further, Mr. Neilsen never explains how the state could use any aspect of any allegedly illegally obtained guilty plea and resulting conviction in future proceedings.

9

## 2. **Legal Principles**

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> The . . . privilege . . . applies not only to persons who refuse to testify against themselves at a criminal trial in which they are the defendant, but also privileges them not to answer official questions put to them in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate them in future criminal proceedings.

*Von Behren*, 822 F.3d at 1144 (brackets and internal quotation marks omitted). "[A] defendant does not lose this protection by reason of his conviction of a crime." *Id.* (brackets and internal quotation marks omitted).

"[T]he Supreme Court has always broadly construed the protection afforded by the Fifth Amendment privilege against self-incrimination." *Id.* "Accordingly, the protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Id.* (brackets and internal quotation marks omitted).

At the same time, "[t]he . . . privilege is only properly invoked when the danger of self-incrimination is real and appreciable, as opposed to imaginary and unsubstantial, and this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Id.* (citation and internal quotation marks omitted). "[W]e will uphold an individual's invocation of the privilege . . . unless it is perfectly clear, from a careful consideration of all the

10

circumstances in the case, that the [person] is mistaken and his answers could not possibly have a tendency to incriminate." *Id*. at 1144-45 (internal quotation marks omitted).

### 3. *Von Behren*

Against this backdrop, we turn to an examination of *Von Behren* to explain why there was no Fifth Amendment violation. In 2005, Von Behren was sentenced in the United States District Court for the District of Colorado to 121 months in prison and three years of supervised release for receipt and distribution of child pornography. In 2014, as Von Behren neared supervised release, the probation office petitioned to modify his release conditions to include a requirement to participate in and successfully complete an approved sex offender treatment program that "complied with standards mandated by the Colorado Sex Offender Management Board (SOMB)," which had been directed to "develop[] and implement[] statewide standards for the assessment, evaluation, treatment, and behavioral monitoring of adult sex offenders." 822 F.3d at 1142.

One of the standards implemented by SOMB required treatment providers to "conduct sexual history polygraphs." *Id*. To that end, Von Behren's provider "presented [him] with a non-negotiable treatment agreement [that] required [him] to complete a non-deceptive sexual history polygraph in order to advance through the program." *Id*. The consequence of "[f]ailure to complete the sexual history polygraph" was "removal from the program." *Id*. Further, the agreement contained a provision concerning use of information gained by the provider regarding any crimes

11

committed by Von Behren: "*I hereby instruct [the provider] to report to any appropriate authority or authorities any occurrence or potential occurrence of any sexual offense on my part* regardless of how [the provider] gains knowledge of such occurrence or potential occurrence." *Id*. (internal quotation marks omitted).

Von Behren objected to the modification on the grounds that the requirement to complete a sexual history polygraph violated his Fifth Amendment right against self-incrimination. The district court sustained his objection and "modified [the] release conditions to exclude any requirement that he admit to a criminal offense other than his offense of conviction." *Id*. at 1142-43.

Nonetheless, a few months later, Von Behren's provider told him he would need to submit to a sexual history polygraph that included four mandatory questions "or leave the program." *Id*. at 1143. The mandatory questions were:

> 1. After the age of 18, did you engage in sexual activity with anyone under the age of 15?
>
> 2. Have you had sexual contact with a family member or relative?
>
> 3. Have you ever physically forced or threatened anyone to engage in sexual contact with you?
>
> 4. Have you ever had sexual contact with someone who was physically asleep or unconscious?

*Id*. (internal quotation marks omitted).

Von Behren filed an emergency motion to block the exam. The district court reviewed the proposed questions, denied the motion, and ordered Von Behren to complete the sexual history polygraph. "Specifically, the court noted [there was no

12

incrimination because the] answers would not specify the time, the place, the identity of any victim, or other people involved." *Id.* (internal quotation mark omitted).

Next, Von Behren filed an immediate appeal and asked the district court to stay its order. The court denied the stay motion. We granted Von Behren's motion for an emergency stay of the polygraph and ultimately reversed. Among other things, we held Von Behren was being asked to incriminate himself because although "[a]n affirmative answer to any of [the four mandatory questions] could not support a conviction on its own, . . . [t]he Fifth Amendment [was] triggered [because the answers] would provide a lead or a link in the chain of evidence needed to prosecute the speaker." *Id.* at 1145 (internal quotation marks omitted).

### 4. <u>Analysis</u>

We agree with the district court that Mr. Neilsen was not asked to incriminate himself by agreeing to "participate in a sex offender intake, evaluation and successfully complete treatment at the discretion of the Sex Offender Supervision Team." R. at 98. Unlike Von Behren, Mr. Neilsen was not asked to say anything until the team decided, if ever, on treatment that required Mr. Neilsen to provide answers to questions that might tend to incriminate him. Until that time, with no information as to what (if any) questions would be asked, there was no "real and appreciable" danger of self-incrimination for Mr. Neilsen. *Von Behren*, 822 F.3d at 1144 (internal quotation marks omitted). Moreover, it is unlikely that Mr. Neilsen would face the same or similar questions in view of our decision in *Von Behren*.

But assuming for the sake of argument there was a Fifth Amendment violation, the law was not clearly established. A reasonable official would have understood that requiring Mr. Neilsen to submit to a polygraph examination that asked questions similar to those posed to Von Behren would violate the Fifth Amendment. But that same official would not reasonably understand *Von Behren* to stand for the general proposition that simply requiring a parolee to undergo evaluation and treatment, at the discretion of the team, would also violate the Fifth Amendment. Indeed, any such reading of *Von Behren* would run afoul of the Supreme Court's admonition "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

## E. Retaliation

### 1. Neilsen's Complaint

The district court dismissed Mr. Neilsen's retaliation claim, reasoning that because there was no Fifth Amendment violation, he was not engaged in constitutionally protected activity when he refused to sign the Parole Agreement. We disagree that Mr. Neilsen was not engaged in constitutionally protected activity; however, we affirm for a different reason. *See Ullery*, 949 F.3d at 1301 n.8 ("[W]e can affirm on any ground supported by the record if the parties had a fair opportunity to address the ground.").

### 2. Legal Principles

"[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140,

14

1144 (10th Cir. 1998) (internal quotation marks omitted). "This principle applies even where the action taken in retaliation would be otherwise permissible." *Id*. (internal quotation marks omitted).

However, "an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity." *Id*. "Accordingly, a plaintiff must prove that but for the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Id*. (internal quotation marks omitted). "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Id*. (internal quotation marks omitted).

### 3. Analysis

Mr. Neilsen's complaint contains only conclusory allegations of retaliation. *See, e.g.*, R. at 13 ("Retaliatory intent for Neilsen's exercise of his constitutionally protected right not to incriminate himself or be subject to compulsory actions by the Defendant(s) was a substantially motivating factor in the false arrest and false incarceration by individual Defendant(s)."). It does not allege "*specific facts*" showing Ms. McElderry retaliated against him for the exercise of his Fifth Amendment rights, as required by *Peterson*, 149 F.3d at 1144 (internal quotation marks omitted).

It just so happens Mr. Neilsen refused to sign for Fifth Amendment reasons, which means he was engaged in constitutionally protected activity; however, "merely because he [was] engaged in protected activity" does "not inoculate[]" him "from the

15

normal conditions of confinement." *Id*. He must "allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." *Id.* (internal quotation marks omitted). The complaint fails this test.

No factual allegations link Ms. McElderry's decision not to release Mr. Neilsen to parole with his refusal to sign the Parole Agreement *on Fifth Amendment grounds*. The only factual allegations relating to Ms. McElderry's motivation reflect an inflexible position that "the agreement in its present form was not negotiable" and she "would not discuss legal issues with" him. R. at 8. In other words, they reflect a perceived lack of authority to release Mr. Neilsen to parole unless he signed the Parole Agreement as presented. No factual allegations show a retaliatory motive.

## F. Conspiracy Claim

The district court adopted the magistrate judge's recommendation to dismiss Mr. Neilsen's conspiracy claim because he failed to plausibly plead a claim for relief. Because Mr. Neilsen fails to address the issue as required under Federal Rule of Appellate Procedure 28(a)(8)(A), he has waived appellate review. "Although a pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, this court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (brackets, citation and internal quotation marks omitted). Where, as here, issues "are

16

not adequately briefed," they "will be deemed waived." *Id*. at 841 (internal quotation marks omitted).

### III.  CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court

Mary Beck Briscoe
Circuit Judge