Filed 10/19/15  Hicks v. Glendale Adventist Medical Center CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEBRA LYNN HICKS, | B251915 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC059789) |
| v. | |
| GLENDALE ADVENTIST MEDICAL CENTER, et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of dismissal of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge.  Reversed with directions.

Law Offices of Gary S. Brown and Gary S. Brown for Plaintiff and Appellant.

Diamond & Dragojevic and Scott R. Diamond for Defendant and Respondent Glendale Adventist Medical Center.

Reback, McAndrews, Kjar, Warford, Stockalper & Moore, James J. Kjar, Cindy A. Shapiro, Jacob Kozaczuk and Jon R. Schwalbach for Defendant and Respondent Estelita B. Calica.

Following an apparent drug overdose, plaintiff and appellant Debra Hicks was involuntarily detained at a psychiatric hospital pursuant to Welfare and Institutions Code sections 5150 and 5250.[1] After her detention, she sued the hospital and the attending psychiatrist for a variety of causes of action, including violations of the statutory provisions governing involuntary psychiatric detentions, deprivation of civil rights, intentional infliction of emotional distress, and negligence. The defendants demurred, and the trial court sustained demurrers to the first amended complaint without leave to amend.

We conclude that the demurrers should have been overruled as to the causes of action for (1) violations of statutory duties (§ 5150 et seq.) as to both defendants, (2) intentional infliction of emotional distress as to the hospital only, and (3) negligence as to both defendants. We therefore reverse the judgments and remand the matter for further proceedings.

## STATUTORY OVERVIEW

In 1967, the California Legislature adopted the Lanterman-Petris-Short Act (the LPS Act), section 5000 et seq., to "end the inappropriate, indefinite, and involuntary commitment of persons with mental health disorders, developmental disabilities, and chronic alcoholism," "provide prompt evaluation and treatment of persons with mental health disorders or impaired by chronic alcoholism," and "guarantee and protect public safety." (§§ 5000, 5001.)

Section 5150 of the LPS Act provides that when a person, as a result of a mental health disorder, is a danger to himself or herself or to others, or is gravely disabled, he or she may, upon probable cause, be taken into custody for up to 72 hours "for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Section 5250 of the LPS Act provides that if a person is detained for 72 hours under section 5150, he or she may be certified "for not more than 14 days of intensive treatment related to the mental health disorder" if he or she continues to be a danger to himself or herself or others and has not been willing to accept treatment on a voluntary basis. The person detained has a right to a certification review hearing to be held within four days of detention, to determine whether or not probable cause exists to detain him or her for intensive treatment related to the mental disorder. (§ 5254.)

Section 5278 provides that individuals authorized under the LPS Act to detain a person pursuant to sections 5150 or 5250 "shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."

## FACTUAL AND PROCEDURAL BACKGROUND

## I.

## The Complaint

In September 2011, following an apparent drug overdose, Hicks was placed on an involuntary psychiatric hold pursuant to sections 5150 and 5250 by defendant Glendale Adventist Medical Center (Hospital).[2] Plaintiff filed the present action against the Hospital and Dr. Estelita Calica, the attending psychiatrist who was in charge of the psychiatric unit at the Hospital on December 11, 2012, and she filed the operative first amended complaint (FAC) on May 15, 2013. The FAC alleges as follows:

Hicks suffers from disabling pain related to fibromyalgia and complicated by restless leg syndrome, three herniated disks, two pinched nerves, right knee replacement, incontinence, and bursitis. She was prescribed a variety of medications to reduce pain. She was not suicidal and had never communicated to anyone a desire to commit suicide.

On September 19, 2011, plaintiff went to work but left her pain medication at home and became increasingly uncomfortable as the work day progressed. She returned

_____

[2]      Because the issue on appeal is whether the trial court properly sustained defendants' demurrers to the complaint, our summary of the relevant facts assumes the factual allegations in the complaint are true. (*Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1552.)

home in the early evening and decided to take pain medication to alleviate back pain. Believing that she had to consume a larger dose than usual, plaintiff inadvertently took too much pain medication. Plaintiff's roommate subsequently found plaintiff lying on the apartment floor and called 911 to summon help. Plaintiff was taken by ambulance to the Hospital, where she was admitted to the emergency room at about 7:30 p.m.

Plaintiff was told that because she overdosed on drugs, under Hospital policy she could not leave the Hospital until she was interviewed by a psychiatrist. Subsequently, however, she was admitted to the Hospital and placed on a 72-hour psychiatric hold even though she had not yet been interviewed by a psychiatrist.

Plaintiff was finally seen by a psychiatrist at about 5:00 p.m. on September 20, nearly 20 hours after her admission. The psychiatrist, Dr. Calica, initially determined that plaintiff was not suicidal and that the 72-hour hold should be terminated. However, after plaintiff's friend called the hospital and told a nurse that "she was very concerned about the patient going home because she tried to commit suicide yesterday," the 72-hour hold was " 'resumed.' " Plaintiff attempted to run out of the Hospital and was forcibly returned by Glendale police and Hospital security.

Plaintiff asserts that on the evening of September 20, she was placed in five point restraints and "forcibly and unwillingly subjected to the use of strong antipsychotic medications." Further, while plaintiff was restrained, two male hospital employees engaged in conduct toward the plaintiff that included, "[r]emoving her brassiere and touching her breasts and when the [p]laintiff protested, laughing at her," "[r]emoving her pants to inject her with drugs against her will and when she protested they laughed at her," "[p]lacing their hands inside of her panties and touching her vagina and when she protested, laughing at her," and "forcibly moving her about when she was scared and intimidated and harassing her when she indicated fear." Finally, plaintiff alleges she was denied food and water and was not allowed to use the bathroom, causing her to urinate in her bed through her clothing. Plaintiff ultimately was released from the Hospital on September 26, 2011, "with no appreciable change [of] condition."

4

Plaintiff asserts that at no time during her detention at the Hospital was she suffering from a mental disorder, a danger to herself or others, or gravely disabled. Therefore, at no time relevant to the FAC was she properly subject to the provisions of the Welfare and Institutions Code that govern involuntary psychiatric detentions.

Plaintiff alleges that the conduct described above gave rise to four causes of action against the Hospital and Dr. Calica: (1) violation of statutory duties (first cause of action); (2) violation of federal civil rights (42 U.S.C. § 1983) (second cause of action); (3) intentional infliction of emotional distress (fourth cause of action); and (4) negligence (fifth cause of action).[3]

## II.

## Demurrers

The Hospital and Dr. Calica demurred to the original complaint, and the trial court sustained the demurrers with leave to amend. Following amendment, defendants again demurred. They urged that section 5278, which provides statutory immunity from liability, barred all of plaintiff's claims, and that the FAC failed to state facts sufficient to state a cause of action.[4]

The trial court sustained the demurrers without leave to amend. In its tentative ruling, which it adopted as its final ruling, the court found that the FAC alleged facts demonstrating that the defendants were exercising their authority under section 5150 to detain plaintiff for evaluation and treatment, and thus they were immune from liability under section 5278. The court further found that none of the causes of action was pled with sufficient particularity to withstand demurrer. Finally, the court noted that each of

---

[3]     The complaint also alleges a cause of action for assault and battery (designated as the third cause of action) against "two male Doe defendants." The trial court denied as moot the Hospital's demurrer to that cause of action because it was not alleged against the Hospital. The issue is not before us on appeal.

[4]     Dr. Calica also sought judicial notice in the trial court of a September 23, 2011 Certification Review Hearing Record, which included a referee's finding of probable cause to detain plaintiff for 14 days. The trial court denied the request for judicial notice, and that ruling is not at issue on appeal.

these defects had been identified in its order sustaining the demurrers to the original complaint, and plaintiff had not corrected the defects by amendment. Accordingly, the court denied leave to amend.

Judgments of dismissal were entered July 31 and September 4, 2013. Plaintiff timely appealed.

## DISCUSSION

### I.

### Standard of Review

We review de novo a judgment of dismissal following an order sustaining a demurrer. (*Eckler v. Neutrogena Corp.* (2015) 238 Cal.App.4th 433, 438.) Thus, "we exercise our ' "independent judgment about whether the complaint states a cause of action as a matter of law." ' [Citation.] 'In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable.' [Citation.]" (*Ibid.*)[5]

### II.

### First Cause of Action: Violation of Statutory Duties

The first cause of action alleges violations of the LPS Act, sections 5000 et seq. Defendants assert that plaintiff failed to state with reasonable particularity the facts supporting the alleged statutory violations and to identify the code sections alleged to have been violated; they also assert that each alleged violation is barred as a matter of law by the immunity provision of the LPS Act. For the reasons that follow, we reject both contentions.

---

[5] Dr. Calica asserts that because plaintiff did not designate a reporter's transcript, we should apply the standard of review applicable to judgment roll appeals—i.e., we should presume the trial court's findings to be correct. Not so: Where an appeal is from an order sustaining a demurrer, "a reporter's transcript or agreed on settled statement is not necessary." (*Lin v. Coronado* (2014) 232 Cal.App.4th 696, 700, fn. 2; see also *Chodos v. Cole* (2012) 210 Cal.App.4th 692, 699 [reporter's transcript not necessary where appellate issue is "a purely legal issue based on the filings before the trial court"].) Accordingly, the absence of a reporter's transcript is irrelevant to our standard of review.

6

*A.      Reasonable Particularity*

When a plaintiff pleads a violation of a statutory duty, " 'we think it obvious that a litigant seeking to plead the breach of a mandatory duty must specifically allege the applicable statute or regulation.  Only by so doing may the [defendant] be advised of the factual and legal basis of the claim against it.'  (*Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 292-293.)  If a plaintiff fails to identify the provision of law allegedly violated by the defendant, she 'fail[s] to meet her burden of stating and substantiating a legally sufficient claim of unlawfulness.'  (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 352.)"  (*Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 901-902.)

In the present case, plaintiff alleges a variety of specific violations of the LPS Act, including the following:

● 	Defendants violated section 5150, subdivision (d), by failing to prepare, as required by the statute, "an application in writing stating the circumstances under which [plaintiff's] condition was called to the attention of the peace officer, professional person in charge of the facility designated by the county for evaluation and treatment, member of the attending staff, or professional person designated by the county, and stating that the peace officer, professional person in charge of the facility designated by the county for evaluation and treatment, member of the attending staff, or professional person designated by the county has probable cause to believe that [plaintiff] is, as a result of a mental health disorder, a danger to others, or to himself or herself, or gravely disabled."

● 	 Defendants violated section 5151 in that Dr. Calica did not assess plaintiff in person *prior* to detaining her under section 5150.

● 	Defendants failed to comply with section 5152, which requires that "[e]ach person admitted to a facility for 72-hour treatment and evaluation under the provisions of this article shall receive an evaluation as soon as possible after he or she is admitted and shall receive whatever treatment and care his or her condition requires for the full period that he or she is held."  Plaintiff alleges that she was not evaluated for nearly 20 hours after she was detained, and she never received any treatment or care.

● Defendants violated former section 5157, subdivision (h), by refusing to provide plaintiff with a patient advocate.

● Defendants violated section 5325.2 by injecting plaintiff with antipsychotic medication against her will.

● Defendants violated section 5253 by failing to deliver to plaintiff a copy of the certification notice required by section 5252.

These alleged statutory violations were pled with sufficient particularity to withstand demurrer. The trial court erred in concluding otherwise.

B.      *Statutory Immunity*

Section 5278 of the LPS Act provides: "Individuals authorized under this part to detain a person . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." Defendants contend that this section bars plaintiff's cause of action for statutory violations because "the immunity of Section 5278 necessarily applies to individuals or entities who make the decision to detain when that decision is supported by probable cause."

We do not agree that section 5278 bars plaintiff's statutory claims as a matter of law. In *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068, 1084,1085 (*Heater*), the court rejected a psychiatric hospital's claim that section 5278 provides "an *absolute* immunity" for those involved with involuntary psychiatric detentions.[6] Instead, the court stated, "no other conclusion is possible than that section 5278 means precisely what it says it means, and that civil liability . . . is precluded insofar as the detention is '*in accordance with the law.*' " (*Id.* at p. 1083, italics added.) This language "mean[s] what it plainly says: that while intrusions on personal freedom may be necessary in certain circumstances, those circumstances must be both defined and limited." (*Id.* at p. 1084.)

---

[6]      The court explained that an absolute immunity "would not tend to 'end the inappropriate commitment of mentally disordered persons,' but would tend instead to promote such by relieving commiters from the necessity of compliance with statutory directives." (*Heater*, *supra*, 42 Cal.App.4th at p. 1084.)

As we discussed in the previous section, plaintiff alleges that her detention was not "in accordance with the law" in a variety of ways: She was not evaluated by a psychiatrist prior to being detained, she was not promptly evaluated or treated, she was not provided a patient advocate, she was injected with antipsychotic medication against her will, and she was not provided with a certification notice. Because plaintiff thus has pled that her detention was not in accordance with law, the trial court erred in relying on section 5278 to sustain the demurrers.

Contrary to defendants' arguments, this case is not analogous to *Heater*. *Heater* affirmed an order dismissing a plaintiff's complaint on immunity grounds. However, the dismissal followed a three-day Evidence Code section 402 hearing, during which all parties presented evidence pertaining to the immunity issue. (*Heater*, *supra*, 42 Cal.App.4th at p. 1078.) The *Heater* court held that the dismissal of Heater's complaint was akin to a grant of summary judgment, and thus it reviewed the record to determine whether there were any questions of fact requiring a trial. (*Id.* at pp. 1078-1079.) On the basis of the testimony and the plaintiff's medical records, the court concluded there were no such triable issues of fact. The procedural posture of the present case is far different because we are reviewing orders sustaining demurrers, not an order granting summary judgment. We thus are necessarily limited to the allegations of the FAC, which we must assume to be true. Because the first cause of action alleges sufficient facts to state a claim for violations of the LPS Act, it survives demurrer.

## III.

### Second Cause of Action: Federal Civil Rights Violations
### (42 U.S.C. § 1983)

*A.      Statutory Overview*

The second cause of action alleges federal civil rights violations, actionable through 42 U.S.C. section 1983 (hereinafter, section 1983). Section 1983 provides, in relevant part, that "[e]very person *who, under color of any statute, ordinance, regulation, custom, or usage, of any State* or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

9

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .” (Italics added.)

The United States Supreme Court has held that a section 1983 claim “must embody at least two elements. [A plaintiff must] show that [she has] been deprived of a right ‘secured by the Constitution and the laws’ of the United States. [She] must secondly show that [defendants] deprived [her] of this right acting ‘under color of any [state] statute.’ ” (*Flagg Bros., Inc. v. Brooks* (1978) 436 U.S. 149, 155-156.)

The parties agree that an individual’s wrongful confinement in a psychiatric hospital constitutes a deprivation of liberty that may support a section 1983 claim. (See *Zinermon v. Burch* (1990) 494 U.S. 113, 131.) They disagree, however, as to whether involuntary confinement at the direction of a *private* doctor and a *private* hospital is “under color of” state law.

“The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power ‘possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.’ ” (*West v. Atkins* (1988) 487 U.S. 42, 49.) Although in appropriate cases a private individual or business may be held to have acted under color of state law, “ ‘[the] mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.’ [Citation.]” (*Blum v. Yaretsky* (1982) 457 U.S. 991, 1004.) Rather, the plaintiff must show that “ ‘there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.’ [Citation.]” (*Ibid.*)

The Supreme Court has adopted a “two-part approach” to determining whether the act of a private party is “under color of state law”: “First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a *state*

10

*actor*. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." (*Lugar v. Edmondson Oil Co., Inc.* (1982) 457 U.S. 922, 937, italics added.)

B. *Plaintiff Has Not Adequately Pled That Defendants Were "State Actors"*

Plaintiff concedes that the Hospital and Dr. Calica are, respectively, a private hospital and a private doctor. She urges, however, that they are "state actors" because their authority to subject her to an involuntary psychiatric commitment derives from state law. Plaintiff says: "[A]s the actions complained about are those of individuals deriving their authority from the County of Los Angeles, as provided for in that State law, the question of whether it was done by an agent of the State is . . . easily resolved. [¶] . . . [There is] a direct link between State law and the designated individual and designated hospital."

Plaintiff's assertion that a private hospital and private doctor are state actors because their authority to involuntarily commit individuals to psychiatric hospitals derives from state law has been considered and rejected by eight federal circuit courts. The Tenth Circuit's decision in *Wittner v. Banner Health* (10th Cir. 2013) 720 F.3d 770 (*Wittner*) is illustrative. There, police officers took the plaintiffs' son, Ian, for a mental health evaluation at a private medical center after he made threats against his former employer. A physician concluded Ian likely was mentally ill and a danger to himself or others, and ordered him held at the medical center for a 72-hour evaluation and treatment. While Ian was subject to the involuntary hold, the medical center's on-duty psychiatrist ordered that he be given a sedative and antipsychotic medication. Ian went into cardiac arrest and subsequently died. (*Id.* at pp. 771-772.)

Ian's parents filed suit under section 1983 against the medical center, the psychiatrist, and the nurse who administered the medication. All defendants moved to dismiss the action on the grounds that plaintiffs could not state a claim against them

11

under section 1983 because they were not state actors. The district court granted summary judgment for the defendants, and the plaintiffs appealed. (*Wittner*, *supra*, 720 F.3d at p. 772.)

The Tenth Circuit affirmed. It noted that when plaintiffs have sought to hold private individuals accountable as state actors for constitutional deprivations, courts have applied a variety of tests to determine whether there is a sufficiently close nexus between the state and the challenged action. (*Wittner*, *supra*, 720 F.3d at p. 775.) The court concluded that Ian's alleged involuntary commitment did not state a claim for state action under any of those tests:

*Nexus test*: "One way private actors can become state actors for § 1983 purposes is if the state exercises sufficient 'coercive power' over the challenged action." (*Wittner*, *supra*, 720 F.3d at p. 775.) The state of Colorado "has no ability to force, compel, or even encourage a private facility to admit anyone. Nor does Colorado law influence the kind of medication given to involuntarily committed patients." (*Id.* at p. 776.) Therefore, without more, "a statutory grant of authority for a short-term involuntary hold in a private hospital does not pass the nexus/compulsion test for turning private action of the hospital or the certifying doctor into state action." (*Ibid*.)

*Public function test:* "The 'public function' test asks whether the challenged action is a traditional and exclusive function of the state. [Citation.] 'This test is difficult to satisfy. While many functions have been traditionally performed by governments, very few have been *exclusively* reserved to the State.' [Citation.] In *Spencer v. Lee*, 864 F.2d 1376, 1377 (7th Cir.1989), and *Harvey v. Harvey*, 949 F.2d 1127, 1130-31 (11th Cir.1992) . . . the Seventh and Eleventh Circuits applied the public function test in deciding that involuntary commitment in a private hospital was not state action. The court in *Spencer* reviewed the history of involuntary commitment of the mentally ill and concluded that committing mentally ill persons had never been an exclusive public function in Anglo-American law or under the law of Illinois. Instead, care of the mentally ill was traditionally provided in 'private custody' by 'friends and relations.' *Spencer*, 864 F.2d at 1380-81 [citing Blackstone's Commentaries on the Laws of

12

England]. [¶] . . . Plaintiffs offer no facts regarding the history of mental-health commitment in Colorado to compel a different conclusion here." (*Wittner*, *supra*, 720 F.3d at pp. 776-777, first italics added.)

*Joint action test:* The "joint action" test asks " 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.' [Citation.]" (*Wittner*, *supra*, 720 F.3d at p. 777.) In *Wittner*, the court noted "[p]laintiffs have not alleged that any state officials conspired with or acted jointly in making the decision to medicate Ian Wittner with Haldol. Instead, plaintiffs' theory of state action seems to be one of acquiescence—that by allowing NCMC [North Colorado Medical Center] to hold Ian, the state should be held responsible for an NCMC doctor's decision to medicate him. But '[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action.' " (*Ibid*.)

*Symbiotic relationship test*: The "symbiotic relationship" test "starts by asking whether and to what extent the state's relationship with the private actor goes beyond the " 'mere private [purchase] of contract services.' [Citation.] . . . . [A] public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities." (*Wittner*, *supra*, 720 F.3d at p. 778.) In the present case, "the state lacks the authority to unilaterally place patients like Ian Wittner at NCMC; it merely authorizes NCMC to accept such patients if NCMC so chooses. Plaintiffs do not contend the state 'extensively' participates in patient care, draws up 'detailed contracts' for the care of patients, or dictates the medical 'program.' [Citation.] . . . At best, '[a]ll of petitioner[s'] arguments taken together show no more than that [NCMC] was a heavily regulated, privately owned' facility, which elected to engage in the challenged action in a manner 'permissible under state law. . . . [T]his is not sufficient to connect the State . . . with respondent's action so as to make the latter's conduct attributable to the State . . . .' [Citation.]" (*Wittner*, at pp. 778-779.)

The First, Second, Third, Fifth, Sixth, Seventh, and Eleventh Circuits have rendered decisions consistent with *Wittner*, holding that private doctors and hospitals are not "state actors" when they involuntarily commit individuals to psychiatric facilities

13

under state laws that permit such commitments. (E.g., *Estades-Negroni v. CPC Hosp. San Juan Capestrano* (1st Cir. 2005) 412 F.3d 1, 10 [involuntary psychiatric commitment by private hospital did not give rise to a section 1983 claim because commitment was not " 'fairly attributable to the State' "]; *McGugan v. Aldana-Bernier* (2d Cir. 2014) 752 F.3d 224 [same]; *Benn v. Universal Health Sys.* (3d Cir. 2004) 371 F.3d 165 [same]; *Bass v. Parkwood Hosp.* (5th Cir. 1999) 180 F.3d 234 [same]; *Ellison v. Garbarino* (6th Cir. 1995) 48 F.3d 192 [same]; *Spencer v. Lee* (7th Cir. 1989) 864 F.2d 1376 [same]; *Harvey v. Harvey* (11th Cir. 1992) 949 F.2d 1127 [same].)

Although the decisions of lower federal courts are not binding on us, on questions of federal law they "are entitled to great weight," and generally a refusal to adhere to federal precedent occurs only "where federal decisions provide scant authority for the proposition urged or are divided on an issue." (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 150.) Here, the decisions of federal appellate courts on the federal statutory question before us are both numerous and consistent, and they thus provide a solid foundation for our conclusion that, based on the allegations of the FAC, neither the Hospital nor Dr. Calica was a state actor.

C.      *Plaintiff's Federal Authorities Are Inapposite*

Plaintiff urges that this court should reject the authorities discussed above and instead follow *Ellis v. City of San Diego* (9th Cir. 1999) 176 F.3d 1183, a Ninth Circuit case that addressed the involuntary hospitalization of an arrestee. In that case, Ellis alleged that following his arrest for domestic violence, police officers transported him to a University of California medical center, where he was sedated, catheterized, and had blood drawn. (*Id*. at p. 1187.) He subsequently was incarcerated for almost two years. (*Ibid*.) After his release, he sued a variety of defendants, including the medical center, a doctor, and a nurse, for federal constitutional violations pursuant to section 1983. (*Ellis v. City of San Diego*, at p. 1187) The district court dismissed all of the plaintiff's claims with prejudice, and he appealed. The Ninth Circuit reversed, holding, among other things, that the plaintiff had adequately pled a valid section 1983 claim. (*Ellis v. City of San Diego*, at p. 1191.)

14

The holding in *Ellis* does not control the present case.  Ellis was taken to a *public*, state-run medical center staffed by *public* employees—not, as in the present case, a *private* hospital staffed by *private* employees.  The court thus had no reason to consider whether a private hospital or a private employee were "state actors" within the meaning of section 1983.

*Jensen v. Lane County* (9th Cir. 2000) 222 F.3d 570 is also inapposite.  There, Jensen was arrested and held in jail; two days later, a county employee recommended that Jensen be taken for evaluation to a county psychiatric hospital.  (*Id.* at p. 572-573.)  A psychiatrist signed an order detaining Jensen.  After his release, Jensen sued the psychiatrist and others, urging that they had violated his constitutional rights by ordering him admitted to the psychiatric hospital without due process of law.  (*Ibid.*)

The district court granted summary judgment for the psychiatrist, finding that his conduct did not constitute "state action."  (*Jensen v. Lane County*, *supra*, 222 F.3d at p. 574.)  The Ninth Circuit reversed, concluding that "contract services provided by licensed private physicians to municipal governments in the detention and examination of persons brought into treatment facilities by police officers as possible mental patients constitute[] state action within the meaning of § 1983."  (*Ibid.*)  The court explained: "The record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others.  County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both [private] psychiatrists and county crisis workers) and [a private psychiatric group] helps to develop and maintain the mental health policies of [the county psychiatric hospital]."  (*Id.* at p. 575.)

In so concluding, the court acknowledged and distinguished the decisions of other circuit courts holding that psychiatric commitments by private physicians did not give rise to section 1983 actions:  "When purely private actors obtain the help of a private physician to bring about the involuntary admission and detention of an allegedly mentally ill person for psychiatric examination, courts that have addressed this scenario in the

15

§ 1983 context have held that there is no state action.  [Citation.]  The courts analyzing the private resort to state power argument have rejected it.  They point out that the license to practice medicine is also created by the state and, in a state-by-state analysis, have held that mental health commitments do not constitute a function 'exclusively reserved to the State.'  Therefore, a person wrongly committed for evaluation is not necessarily the victim of state action.  *Because our case combines private actors and government officials, it does not fall within the rule of the cases concerning private actors who perform a 'public function.'*"  (*Jensen v. Lane County*, *supra*, 222 F.3d at pp. 574-575, italics added.)

The present case is distinguishable from *Jensen*.  As the *Jensen* court acknowledged, there is a significant difference for section 1983 purposes between an involuntary commitment by a *private* physician at a *private* hospital, and a commitment initiated by a *county* employee of an individual held in a *county* jail.  Because the "combin[ation]" of "private actors and government officials" the court found persuasive in *Jensen* is not present in the case before us, *Jensen* does not guide our analysis.

> D.      *California Law Is Not Meaningfully Different Than the Laws of the States Addressed in the Federal Cases*

Plaintiff urges finally that the federal authorities discussed in Section III B., *ante*, should not control the present case because those authorities rely on state laws that are "far different than [the laws of] California."  Plaintiff fails to demonstrate any meaningful differences, however.  To the contrary, as in *Wittner*, discussed above, plaintiff has not alleged that California has the ability "to force, compel, or even encourage a private facility to admit anyone" (*Wittner*, *supra*, 720 F.3d at p. 776); that any state officials "conspired with or acted jointly in making the decision to" detain or medicate plaintiff (*id.* at p. 777); that California " 'extensively' participates in patient care, draws up 'detailed contracts' for the care of patients, or dictates the medical 'program' " (*id.* at p. 779); or that involuntary commitment of psychiatric patients is "a traditional and exclusive function of the state" (*id.* at pp. 776-777).

16

For all of these reasons, we conclude the FAC did not plead that the Hospital and Dr. Calica were state actors.  The trial court thus did not err in sustaining the demurrer to the second cause of action for federal civil rights violations.

## IV.

### Fourth Cause of Action:  Intentional Infliction of Emotional Distress

The fourth cause of action alleges intentional infliction of emotional distress. " 'The elements of a cause of action for intentional infliction of emotional distress are (1) the defendant engages in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, emotional distress; (2) the plaintiff suffers extreme or severe emotional distress; and (3) the defendant's extreme and outrageous conduct was the actual and proximate cause of the plaintiff's extreme or severe emotional distress. (*Potter v. Firestone Tire & Rubber Co*. (1993) 6 Cal.4th 965, 1001.)  "[O]utrageous conduct" is conduct that is intentional or reckless and so extreme as to exceed all bounds of decency in a civilized community. (*Ibid*.)  The defendant's conduct must be directed to the plaintiff, but malicious or evil purpose is not essential to liability. (*Ibid*.)' (*Ragland v. U.S. Bank National Assn*. (2012) 209 Cal.App.4th 182, 203.)" (*So v. Shin* (2013) 212 Cal.App.4th 652, 671.)

The Hospital makes a cursory assertion that plaintiff "has failed to set forth facts . . . showing extreme and outrageous conduct by [the Hospital]."  We do not agree.  The FAC alleges, among other things, that employees of the Hospital physically restrained plaintiff, injected her with antipsychotic medication over her objection, denied her food and water, denied her access to the bathroom, and sexually assaulted her.  A jury reasonably could conclude that such conduct, if proved, was extreme and outrageous. (See, e.g., *So v. Shin*, *supra*, 212 Cal.App.4th at p. 672 ["whether conduct is 'outrageous' is usually a question of fact"].)

We reach a different conclusion with regard to the allegations against Dr. Calica. While the FAC alleges technical violations of the LPS Act by Dr. Calica, it nowhere alleges conduct that a reasonable juror could conclude was extreme and outrageous.  We

therefore reverse the order sustaining the demurrer to the fourth cause of action as to the Hospital, but affirm it as to Dr. Calica.

## V.

### Fifth Cause of Action:  Negligence

The fifth cause of action alleges negligence.  The elements of a cause of action for negligence are "duty, breach, causation, and damages."  (*Chavez v. 24 Hour Fitness USA, Inc*. (2015) 238 Cal.App.4th 632, 640.)

" '[S]tatutes and regulations may be used to establish duties and standards of care in negligence actions.'  [Citation.]  'Statutes may be borrowed in the negligence context for one of two purposes:  (1) to establish a duty of care, or (2) to establish a standard of care.  [Citations.]'  [Citations.]"  (*Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1299.)

In the present case, as we have said, the LPS Act imposed on the Hospital and Dr. Calica a variety of statutory duties, which plaintiff alleges the defendants breached when they detained her, causing her damages.  Plaintiff specifically alleges that she was not evaluated by a psychiatrist prior to being detained, was not promptly evaluated or treated, was not provided a patient advocate, was injected with antipsychotic medication against her will, and was not provided with a certification notice.  These violations, if proved, would support a negligence claim and are outside the statutory immunities.  The demurrers to the fifth cause of action should have been overruled.

## DISPOSITION

The judgments are reversed. The cause is remanded to the superior court with directions to vacate its orders sustaining the defendants' demurrers without leave to amend and to enter a new order (1) overruling the demurrers to the first cause of action (violation of statutory duties) as to both defendants, (2) sustaining the demurrers to the second cause of action (violations of federal civil rights) as to both defendants, (3) overruling the demurrer to the fourth cause of action (intentional infliction of emotional distress) as to the Hospital, and sustaining it as to Dr. Calica, and (4) overruling the demurrers to the fifth cause of action (negligence) as to both defendants. Plaintiff is awarded her appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

KITCHING, J.[*]

---

[*]  Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19